Argued June 3, reargued December 8, 1969, affirmed
September 18, 1970

SMITH, *Appellant, v.* COOPER ET AL,
*Respondents.*

475 P2d 78

*Harry A. Slack, Jr.*, Coquille, argued the cause for appellant. On the briefs were Slack & Slack, Coquille.

*Norma Paulus*, Salem, argued the cause for respondents. With her on the brief were Clark & Marsh, Salem.

Before PERRY,* Chief Justice, and McALLISTER, SLOAN, O'CONNELL, GOODWIN,** DENECKE and HOLMAN, Justices.

DENECKE, J.

The plaintiff executrix brought this action to recover damages for the death of her testator which occurred when a car in which he was riding went off the highway and crashed. The defendants are State Highway Commission officials and employees and their alleged negligence was in planning, establishing and maintaining the highway at the place of the accident. The defendants moved to quash the service of summons upon the ground that the court had no jurisdiction because the defendants as officers and agents

* Perry, C.J., retired June 1, 1970.
** Goodwin, J., resigned December 19, 1969.

of the state are immune from action. The motion was allowed and plaintiff appeals.

Some procedural problems are present which we believe should be discussed although the parties did not raise them.

■ This appeal is from an order quashing service of summons. We have previously expressly approved the practice of both the state and its employees raising their defense of immunity by filing either a demurrer or a motion to quash. *Hanson v. Mosser*, 247 Or 1, 5-6, 427 P2d 97 (1967). When the defense of immunity is raised the issue is whether the complaint states a cause of action or does it show on its face that the defendants are immune from suit because they are either the state or state officials or employees entitled to immunity.

■ The sufficiency of the allegations of a complaint is normally tested by a demurrer. We have held in a case not involving immunity that a motion to quash service is not a proper method to determine the sufficiency of a complaint. *State ex rel Sullivan v. Tazwell*, 123 Or 326, 333, 262 P 220 (1927), cert granted 276 US 613, 48 S Ct 324, 72 L Ed 731, dismissed 277 US 575, 48 S Ct 527, 72 L Ed 995 (1928).

■ We conclude that to be consistent with the general rules of pleading the proper procedure to raise the issue of immunity should be by the filing of a demurrer. The holding of *Hanson v. Mosser,* supra (247 Or 1), to the contrary is overruled.

Very recently in *Ter Har v. Backus*, 256 Or 288, 473 P2d 143 (1970), we reviewed decisions discussing appeals brought both from orders granting motion to quash and sustaining demurrers. In *Ter Har*

*v. Backus,* supra (256 Or 288), we dismissed the appeal from an order granting a motion to quash.

In that case it was obvious that the order quashing the service did not terminate the action because the statute of limitations could not have run on the cause of action for property damage. We stated in effect that if the order quashing service did effectively dispose of the action we would probably not dismiss that particular appeal. We did announce, however, that in the future we would not entertain an appeal from an order quashing service, but only from a final judgment.

We give prospective application to a similar rule in this case. Because our opinion in *Hanson v. Mosser,* supra (247 Or 1), probably caused defendant to challenge the complaint in this case with a motion to quash instead of a demurrer, we will treat the motion as did the parties and the trial court as asserting the contention of the defendants that the complaint did not state a cause of action against them because they were immune from liability. *Hanson v. Mosser,* supra (247 Or 1), also probably caused the plaintiff to appeal from the order quashing service rather than an order of dismissal. In the future that contention of immunity must be raised by a demurrer and the appeal must be taken from a final judgment. *Ter Har v. Backus,* supra (256 Or 288).

I

*Is This in Reality an Action Against the State?*

The facts to be considered are as alleged in the complaint. The defendant Cooper was the State Highway Engineer. The defendant Smitton was the acting District Maintenance Superintendent of the

Highway Commission for District 5-B. The defendant Parson was the acting Division Engineer of the Commission for Division 5.

The automobile in which decedent was riding was driving north on Highway 74 approaching a junction at which the driver intended to turn and proceed westerly on Highway 30. At the junction, allegedly due to the negligence of the defendants, the vehicle continued to the north instead of turning and went off the road and crashed.

All of the defendants were alleged to be negligent in designing the road so that a driver was not aware that he was to turn west rather than to continue straight, in failing to place a guardrail on the north edge of the turn, in failing to post any or adequate signs warning of the dangerous turn, in posting misleading and distracting signs, in designing a tight, unbanked turn, in failing to provide lighting, in painting the center stripe to indicate that traffic was to continue straight ahead, in failing to provide reflectors indicating the turn, and in providing a left turn sign which was not uniform with other signs at other junctions in Oregon.

This cause of action arose before the effective date of the Oregon Tort Claims Act, ORS 30.260-30.300. However, under that Act some of the problems present in this appeal still remain.

The defendants contend that although this action is nominally against state officials and employees, it is in reality an action against the State of Oregon and the court does not have jurisdiction because the state has not waived its sovereign immunity. The defendants primarily rely upon *Bacon v. Harris*, 221 Or 553, 352 P2d 472 (1960), in support of their contention.

The plaintiff in that case was injured when she fell on a stairway while attending a basketball game at the University of Oregon's McArthur Court. She named as defendants the Department of Higher Education, the nine members of the State Board of Higher Education, the University President and Athletic Director and a university employee who had charge of the ushers at McArthur Court. The trial court set aside a judgment for the plaintiff and we affirmed.

We there stated, "[a]lthough it is not named as a defendant we think this is, in legal effect, an action against the State Board of Higher Education and will so treat it." 221 Or at 555. We held that the State Board had governmental immunity and, therefore, the action could not be maintained against it. A reading of the entire opinion makes it clear that the above-quoted statement was intended to refer only to the action against the nine members of the State Board. The opinion closes:

> "We are also satisfied that under the rule announced in *Antin v. Union High School Dist. No. 2,* 130 Or 461, 280 P 664, the case can not be maintained against the individual defendants. There is no allegation that any of them committed any act of negligence contributing to plaintiff's injuries." 221 Or at 557.

■ Plaintiff's action is not, in effect, an action against the State of Oregon. The action is against the defendants individually; any liability established will be a personal liability against the defendants as individuals; and the government's property and activities are not directly threatened. This action is maintainable unless the defendants as officers, agents or employees of the state have immunity because of their relationship to the state.

## II

*Did the Legislature Lift the Immunity for State
Employees by Authorizing the Purchase of Liability
Insurance for Such Employees?*

The plaintiff contends that ORS 243.110[1] authorizing state agencies to purchase insurance to protect its officers and employees against liability and the Highway Commission's purchasing of such insurance lifted any immunity the defendants might have had.[2]

Plaintiff relies upon *Vendrell v. School District No. 26C*, 226 Or 263, 360 P2d 282 (1961). Plaintiff's reliance upon *Vendrell* is misplaced:

"* * * In *Vendrell* we held that ORS 332.180, authorizing school districts to procure liability insurance was a 'general law' waiving sovereign immunity and, therefore, Art IV, § 24, of the Oregon

---

[1] Since repealed, however, replaced by ORS 30.280.

[2] ORS 243.110: "(1) Any county, school district, municipal corporation and any state agency, including any state officer, board, commission, department, institution or branch of the state government, may purchase liability insurance, in such amounts and containing such terms and conditions as it may deem necessary, for the protection of its board or commission members, officers and employes against claims against them incurred by such board or commission members, officers and employes in the performance of their official duties. The premiums for such insurance shall be paid out of appropriations or funds available for expenditure by the state agency, district or county purchasing insurance.

"(2) No state agency, county, school district or municipal corporation shall purchase or renew liability insurance under this section unless the policy or contract of insurance provides that the insurer will not, in any proceeding brought on the policy or contract, assert as a defense the immunity of this state, or such county, school district or municipal corporation, against suit.

"(3) Nothing in this section shall be construed as a waiver by the State of Oregon of any immunity against suit."

Constitution was satisfied. Art IV, § 24, provides:

" 'Provision may be made by general law, for bringing suit against the State, as to all liabilities originating after, or existing at the time of the adoption of this Constitution; but no special act authorizing such suit to be brought, or making compensation to any person claiming damages against the State, shall ever be passed.' " *Hale v. Smith*, 254 Or 300, 307, 460 P2d 351, 354 (1969).

██ Art IV, § 24, of the Oregon Constitution and *Vendrell* concern the immunity of the state and its subdivisions, that is, sovereign immunity. In this appeal we are not concerned with sovereign immunity; we are concerned with the immunity of state officers and employees. Sovereign immunity and the immunity of state officers and employees are two different legal concepts and have two different origins and purposes. Art IV, § 24, of the Oregon Constitution, providing that sovereign immunity can be lifted by the legislature enacting a general law to that effect does not apply to the immunity of state employees.

Mr. Justice Traynor remarked in *Muskopf v. Corning Hospital District* (the case ending sovereign immunity in California), 55 Cal2d 211, 221, 11 Cal Rptr 89, 359 P2d 457 (1961): "Thus this immunity [that of state employees] rests on grounds entirely independent of those that have been advanced to justify the immunity of the state from liability for torts for which its agents are admittedly liable."

Judge Learned Hand stated that the doctrine of immunity for public employees was based upon a policy of freeing public employees from fear of retaliation for unpopular decisions so that they could function freely and thereby give unflinching discharge of their duties. *Gregoire v. Biddle*, 177 F2d 579, 581

(2d Cir 1949), cert den 339 US 949, 70 S Ct 803, 94 L Ed 1363 (1950). Prosser also believed that public employees would be unduly intimidated in the discharge of their duties if they could be sued for actions which later were determined to be negligent. Prosser, Law of Torts (3d ed), 1014. Another reason advanced for the immunity of state employees is that without immunity, highly skilled employees would not accept public positions because the potential liability was not commensurate with the relatively low compensation that public bodies pay. Van Alstyne, *Government Tort Liability: A Public Policy Prospectus*, 10 UCLA L Rev 463, 474, 478 (1963).

In Oregon as well as most jurisdictions this immunity for public employees is court made. On the other hand, sovereign immunity is incorporated in our constitution. *Vendrell*, supra, at 226 Or 228-9. Accordingly, we are not concerned whether ORS 243.110 is a "general law" as that phrase is used in Art IV, § 24, waiving immunity.

■■ Although immunity for public officials is judicially created, it can be set aside by legislative act. However, judicially-created law is not changed by legislative act unless the intent of the legislature to do so is clearly shown. *Lovell v. School Dist. No. 13*, 172 Or 500, 143 P2d 236 (1943). We do not construe this statute as clearly evidencing a legislative intent to change the law and to take away the immunity granted to public employees. Plaintiff argues that the statute would be meaningless unless it is construed to eliminate the employee immunity, for otherwise the insurance would be useless. This argument is defective because the traditional immunity of government employees is not all-encompassing, as is discussed, infra.

Hence, notwithstanding the absence of a waiver of immunity, the insurance provided for by ORS 243.110 would be useful with regard to matters in which the employees have traditionally not enjoyed immunity.

The statute declares that it is for the protection of public employees. Nothing is accomplished for the protection of employees by taking away their immunity and substituting liability insurance.

We hold that the immunity of state employees was not withdrawn by the legislature by the enactment of ORS 243.110.

### III

*Were the Defendants Performing a "Discretionary" Function?*

The defendants contend they are immune from liability for negligence because their work which is alleged to have been done negligently was in the exercise of their "discretionary" function as distinguished from their "ministerial" function.

This court, as well as the courts of other jurisdictions, has held that a public employee is not liable for negligently performing a discretionary function, whereas a public employee is liable for negligently performing a ministerial function. A line differentiating ministerial functions from those which are discretionary has never been clearly drawn. This court and many others have had difficulty with this task.

In *Jarrett v. Wills*, 235 Or 51, 383 P2d 995 (1963), we held the state employee was performing a discretionary function and, therefore, was immune. We acknowledged the absence of a clear guideline but found that the duties and functions of the particular

state employee, the superintendent of a state hospital for the mentally retarded, were obviously discretionary. His allegedly negligent act was granting an inmate a leave of absence. We did not attempt to set standards for classifying functions as "discretionary" or "ministerial."

In *Antin v. Union High School Dist. No. 2*, 130 Or 461, 468-469, 280 P 664, 66 ALR 1271 (1929), this court attempted to state the distinction between "discretionary" and "ministerial":

"It is said, however, that official duties are of two classes: ministerial or mandatory, and discretionary or judicial, and that the immunity of a municipality does not exist if the act complained of was done in the performance of a ministerial duty, such as the repair of a fire-alarm system, as held in Wagner v. Portland, *supra*. It was held in that case that the installation and maintenance by a city of a fire-alarm system is a governmental function, but that, when out of repair, the repairing of it was ministerial and not governmental, and that the municipality was liable for its negligence in making the repair. It was also held in *Ryder v. La Grande*, *supra*, that the repair of a sidewalk was ministerial, although the city was under the duty of keeping its sidewalks in repair and reasonably safe for travel. Other cases holding to the same effect are *Giaconi v. City of Astoria*, 60 Or. 12 (113 Pac. 855, 118 Pac. 180, 37 L. R. A. (N. S.) 1150), *Warren v. Astoria*, 67 Or. 603 (135 Pac. 527), and *Myrtle Point T. Co. v. Port of Coquille River*, 86 Or. 311 (168 Pac. 625). In the Giaconi case it was held that a municipal corporation, in devising plans for improving public highways within its borders, acts judicially, and, when proceeding in good faith, is not liable for errors of judgment, but that, in constructing the work, it acts ministerially and is bound to see that the plan

is executed in a reasonably safe and skillful manner, and that if the city itself executes any public work it acts ministerially and is liable for any injury resulting from its negligence or maladministration. In defining these two classes of official duties, it is said that ministerial or mandatory duties, 'are such as a person performs in a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to, or the exercise of, his own judgment upon the propriety of the act being done,' while discretionary or judicial duties are 'such as necessarily require the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued,' and that ministerial duties may be delegated while duties involving the exercise of discretion in the public weal cannot: 43 C. J., p. 713. The Standard Dictionary sets out one of the meanings of 'ministerial' as 'subservient or subsidiary; mandatory as opposed to judicial or discretionary; pertaining to an act or duty performed in accordance with legal authority, rather than with regard to propriety, judgment, etc.'" 130 Or at 468-469.

This distinction is made in the *Antin* case to determine whether or not a governmental body, a school district, should be held liable.

Our decisions involving the planning and construction of roads are not helpful in answering the problem of what is "discretionary" and what is "ministerial." *Rankin v. Buckman*, 9 Or 253 (1881); *Batdorff v. Oregon City*, 53 Or 402, 409, 100 P 937 (1909); *Giaconi v. City of Astoria*, 60 Or 12, 113 P 855, 118 P 180, 37 LRA NS 1150 (1911).

In *Ashland v. Pacific P. & L. Co.*, 239 Or 241, 254, 395 P2d 420, 397 P2d 538 (1964), we stated as dictum that a highway commission employee would

be liable if he failed to erect an adequate highway sign and this was the cause of plaintiff's injuries. We did not discuss any possible immunity for the state employee.

Decisions from other jurisdictions involving road planning, construction and maintenance have generally followed the line that the planning and designing of the road or highway is done in the performance of a discretionary function while maintenance is the performance of ministerial function. Bennett and Sather, *State Tort Liability—The Design, Construction and Maintenance of Public Highways—Vehicular Accidents,* 19 Drake L Rev 33 (1969) ; Annotations, 40 ALR 39 (1926), 57 ALR 1037 (1928).

*Wilbrecht v. Babcock,* 179 Minn 263, 228 NW 916 (1930), is an example of such decisions. A defendant was the commissioner of highways and the plaintiff alleged he planned and constructed a highway in such a manner that the highway caused surface water to flow upon plaintiff's land to his damage. The court held the commissioner's demurrer should have been sustained as he was performing a discretionary function:

> "The highway in question is a part of the trunk highway system established by law and which the state is constructing in its governmental capacity. The defendant as commissioner of highways was charged by law with the duty of locating, constructing and maintaining it. The legislature did not specify the grade nor make any regulations in respect to the details of the work but left all such matters to be determined by the commissioner. The duties imposed upon him require the exercise of a high degree of skill, judgment and discretion, and are performed solely for the benefit of the public. It is well settled that an officer charged with the

performance of such duties is not personally liable for errors of judgment, or for acts done within the scope of his authority, unless it appears that the particular acts complained of were not only unnecessary, but were done corruptly or maliciously. * * *." 179 Minn at 264-265.

The difficulty with all these attempts to state the distinction between "discretionary" and "ministerial" is that all, or almost all, acts performed by government employees involve some judgment or choice; that is, the employees have more than one alternate course of performance and they make a decision to follow one of the several alternatives. The issue is really, how much "discretion" must be involved in the performance so as to render the employee immune? This means that at some point along the continuum of discretion a division must be made with liability on one side and immunity on the other and this division must necessarily be arbitrary.[9]

---

[9] Some of the discussion of whether an employee was acting in a "discretionary" function may really be an inquiry whether the employee was negligent. In Sisley v. United States, 202 F Supp 273 (DC D Alaska 1962), considering the function of planning the grade and culverts of a highway, the court stated: "Errors in judgment, if such may be found, are not negligence in construction. These plans were the result of policy judgment and decision and as we have noted, where there is room for such there is discretion." 202 F Supp at 275.

This court and others have distinguished between errors in judgment and negligence and held there is no liability for the former. Brown v. Spokane, P. & S. Ry. Co., 248 Or 110, 123, 431 P2d 817 (1967). In discussing whether an act is "discretionary," courts freely use "judgment" as a synonym of "discretion."

The attempt to determine whether the function was "discretionary" may be an inquiry whether the employee was negligent in another sense. The employee sued may have performed exactly as his superior directed or he may have performed in the only fashion possible under the restrictions placed upon him by his superiors. An employee under such circumstances should not be

The Federal Tort Claims Act has a similar problem and decisions interpreting that act should be examined. The Act provides that the United States shall not be liable for injury caused by performance of a "discretionary function" on the part of an agency or employee. 28 USCA § 2680 (a). The United States Supreme Court interpreting this portion of the act had the same semantic difficulty as other courts. *Dalehite v. United States*, 346 US 15, 35-36, 73 S Ct 956, 97 L Ed 1427 (1953):

> "It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so, the protection of § 2680 (a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion."

---

liable if he is a public employee. For example, in this case, evidence might be introduced that the tightness of the curve resulted from a decision of the highway commission, dictated by available funds, that only so much property could be purchased for the junction and, therefore, a curve such as the one built was the only feasible one.

Dalehite v. United States, supra (346 US at 36), referring to the liability of the United States and not employees, stated: "It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable."

The *Dalehite* case was subsequently modified in some respects; however, the principle above quoted remains the approved interpretation. The Court and the Act were concerned with the liability or immunity of the government and not employees.

*Mahler v. United States*, 306 F2d 713 (3d Cir 1962), applied the *Dalehite* principle to highway construction. The plaintiffs were injured when a car in which they were riding hit a boulder that had fallen from a steep embankment alongside the highway. Plaintiffs contended that the United States was liable because the Secretary of Commerce had approved faulty plans for the highway and the faulty planning caused the boulder to be on the highway. The court held the secretary was performing a discretionary function when he approved the design of the highway and, therefore, the United States was immune:

> "* * * The determination by the Secretary of Commerce to approve the plans and specifications for the Penn-Lincoln project, the decision which initiated the federal government's financial participation, was obviously a policy judgment of the type most important to the success of the federal-aid highway program. It is administrative action requiring the conscious weighing of such factors as location and anticipation of future traffic flow. The same must be said of federal guidance during the pre-approval design stage. As such, we think that these decisions fall on the planning side of the planning-operational distinction drawn in the Dalehite case, * * *." 306 F2d at 723.

In *Sisley v. United States*, 202 F Supp 273 (DC D Alaska 1962), plaintiff alleged that the Bureau of Public Roads had planned the highway without providing culverts under the highway to drain away the water and it flooded plaintiffs' land. The court applied

the same planning-operational distinction and held the omission of culverts was a part of the planning which involved a "discretionary" function.

Making the distinction between "discretionary" and "nondiscretionary" depend upon whether the negligence was at the planning or at the operational stage does not, in our opinion, necessarily follow from the *Dalehite* opinion; and even if it does, such reasoning is open to criticism. The above quote from *Dalehite*, we believe, evidences that the Court did not intend to make the distinction that the planning function was discretionary whereas the operational function was not. In our opinion the distinction attempted to be drawn was largely a semantic one, i.e., "Where there is room for policy judgment and decision there is discretion." 346 US at 36.

Some of the criticism of the planning-operational distinction is:

"Acceptance of classifications based on the level of the discretionary activities involved would provide a terminology with a superficial appeal. It would, however, do little to solve the problem of what is an exempt discretionary function. Indeed, the distinction between activities at the 'operational level' and those at the 'planning level' is susceptible of no greater precision in definition than the distinction between activities which are 'governmental' and those which are 'non-governmental' or 'proprietary' * * *." Peck, *The Federal Tort Claims Act—A Proposed Construction of the Discretionary Function Exception*, 31 Wash L Rev 207, 219 (1956).

"The fundamental difficulty with the planning-operational approach is that it is likely to become a mere labeling approach. This immediately creates the further problem of setting up criteria for de-

termining what activity is operational and what is planning. As with the case of the older governmental-proprietary test of municipal liability, it is evident that either term may be applied in a given situation, depending on how expansively or narrowly one interprets the problem or on the result desired. * * *." Note, *The Discretionary Exception and Municipal Tort Liability: A Reappraisal,* 52 Minn L Rev 1047, 1062 (1968).

*American Exch. Bank of Madison, Wis. v. United States,* 257 F2d 938 (7th Cir 1958), illustrates that what is termed operational and what is termed planning depends upon how widely or narrowly the court views the category. The plaintiff fell on postoffice steps and alleged the government was negligent in failing to include a handrail in designing the steps:

"The trial court reasoned that the function of deciding whether a handrail should be installed on a post office building was one for the General Services Administration, which agency was charged with the duty of maintenance of the premises, and the Court concluded that this was a discretionary function. * * *." 257 F2d at 940-941.

The Court of Appeals reversed, stating:

"Undoubtedly there was an exercise of discretion in deciding whether and where a post office building should be located in Madison, Wisconsin, but whether a handrail should be installed as a safety measure on wide stone steps involves action at the operational level and would seem to involve no more discretion than fixing a sidewalk on post office grounds that might be in need of repair." 257 F2d at 941.

Omitting culverts under a highway is considered by one court to be an omission in the planning stage while omission of a handrail on a stairway is con-

sidered by another court to be an omission at the operational level.

This court was critical of this planning-operational distinction many years ago:

"An examination of the cases discloses that the courts of some states, notably Indiana and Maryland, attribute negligence to a city in the adoption of defective plans. Most of the courts, however, confine negligence to the execution of the plans. In sound reason, it can matter little in many cases whether negligence be predicated of careless execution of a practical plan for public improvements, or of a vicious and impractical plan itself. Governmental powers should be exercised in accordance with the principles of natural justice and common sense. A municipality ought not to be upheld by the courts in the heedless adoption, under the guise of legislation, of some crude scheme which cannot be accomplished without the infliction of direct, as distinguished from consequential, injuries upon some of its citizens. To hold otherwise would be a long step towards sanctioning the ruthless exercise of arbitrary power. Immunity for mere error or judgment in matters of governmental cognizance ought not to be overturned or impaired; but when public works are planned with such carelessness as to amount to absence of judgment the reason of the rule fails, and the application thereof fails with it." *Giaconi v. City of Astoria,* supra (60 Or at 33).

For reasons above stated we do not find the planning-operational dichotomy to be of assistance and do not adopt it.

The California Tort Claims Act also provides that neither employees nor the state are liable if the employee's conduct causing the injury occurred in the performance of a "discretionary" function. West's Ann Gov Code, §§ 815.2 (b), 820.2. The California court

has not adopted the planning-operational distinction. It has attempted to interpret discretionary by using a variety of factors, which it finds in the underlying reasons for making discretionary acts immune. Although the California court has not been definitive in stating the factors or the content of each factor, we find its basic reasoning of assistance.

In attempting to state when acts are deemed "discretionary" the California court in *Lipman v. Brisbane Elementary Sch. Dist.*, 55 Cal2d 224, 230, 11 Cal Rptr 97, 359 P2d 465 (1961), stated:

> "* * * Although it may not be possible to set forth a definitive rule which would determine in every instance whether a governmental agency is liable for discretionary acts of its officials, various factors furnish a means of deciding whether the agency in a particular case should have immunity, such as the importance to the public of the function involved, the extent to which governmental liability might impair free exercise of the function, and the availability to individuals affected of remedies other than tort suits for damages."

*Ne Casek v. City of Los Angeles*, 233 Cal App2d 131, 43 Cal Rptr 294 (1965), contains a particularly good statement on the subject:

> "Since obviously no mechanical separation of all activities in which public officials may engage as being either discretionary or ministerial is possible, the determination of the category into which a particular activity falls should be guided by the purpose of the discretionary immunity doctrine. * * *." 233 Cal App2d at 135.

The literal meaning of "discretionary" can be a factor in solving the problem when the facts are well

on the "discretionary" side of the continuum.[4] For example, in *Jarrett v. Wills*, 235 Or 51, 383 P2d 995 (1963), we held the superintendent of the state hospital was exercising a discretionary function when he granted an inmate a leave of absence. Such a decision is discretionary in the sense that the superintendent has a wide latitude of decision uncontrolled by any specific rules.

■ The most decisive factor but one most difficult to articulate is that it is essential for efficient government that certain decisions of the executive or legislative branches of the government should not be reviewed by a court or jury. The reason behind such factor is that the bases for the legislative or executive decision can cover the whole spectrum of the ingredients for governmental decisions such as the availability of funds, public acceptance, order of priority, etc.

Judge Fuld, in *Weiss v. Fote*, 7 NY2d 579, 200 NY Supp2d 409, 167 NE2d 63 (1960), attempted to state this principle that certain decisions of the legislative or executive branches should not be reviewable by the judicial branch. In that case the plaintiff brought a personal injury action for a traffic accident against the city of Buffalo. She claimed that the city had negligently fixed the clearance interval for an intersection traffic signal and that as a result, before the north-south traffic could clear the intersection, the signal turned green, permitting the east-west traffic to enter the intersection. A verdict

---

[4] Despite the problems created by the use of the word "discretionary," we are obliged to continue using the word because it is incorporated in the Oregon Tort Claims Act. ORS 30.265 (2)(d).

against the city was set aside by a majority of the Court of Appeals:

"* * * The first set of cases rests immunity on the policy of maintaining the administration of municipal affairs in the hands of state or municipal executive officers as against the incursion of courts and juries, * * *.

"* * * * * *

"* * * To accept a jury's verdict as to the reasonableness and safety of a plan of governmental services and prefer it over the judgment of the governmental body which originally considered and passed on the matter would be to obstruct normal governmental operations and to place in inexpert hands what the Legislature has seen fit to entrust to experts. * * *.

"* * * * * *

"* * * In the area of highway safety, at least, it has long been the settled view, and an eminently justifiable one, that courts should not be permitted to review determinations of governmental planning bodies under the guise of allowing them to be challenged in negligence suits; something more than a mere choice between conflicting opinions of experts is required before the State or one of its subdivisions may be charged with a failure to discharge its duty to plan highways for the safety of the traveling public. * * *." 167 NE2d at 65-67.

The opinion of the Court of Appeals in *In Re Texas City Disaster Litigation*, 197 F2d 771 (5th Cir 1952), states the same principle in a different form:

"The very conception of negligence involves weighing the magnitude of the risk against the utility of the act or the particular manner in which it is to be done. 2 Am. Law Inst., Restatement of Torts, Sec. 291. The authority to determine and consider the factors as to the utility of the conduct and the magnitude of the risk (see same text, secs. 292 and 293) was vested in the executive officers

or agents and not subject to the review of the courts." 197 F2d at 778.

Professor Jaffe has stated some of the factors which he believes should be considered in determining if immunity is to be granted. One of these is similar to the reasoning expressed above. Louis L. Jaffe, *Suits Against Governments and Officers: Damage Actions,* 77 Harv L Rev 209, 219 (1963).

> "* * * We can assume the hypothesis of a governmental decision which creates a risk that could be considered either unnecessary to achieve the end in view or avoidable by an expenditure deemed reasonable. The difficulties of evaluating such a decision in terms of negligence are notorious. The decision will have rested in part on a technical judgment as to the size of the risk and the need to incur it; in part on a political judgment as to who should bear the indirect costs. A judge or a jury is not well equipped either to make such determinations initially or to review them. To be sure some private negligence actions involve similar issues, but even these cases approach the margin of a jury's or a judge's competence. When governmental actions are involved, the scale of both the technical and the financial factors is likely to be much more complex and much more expensive." 77 Harv L Rev at 235-236.

Professor Jaffe explained the nature of this factor by pointing out that the Texas City disaster cases were extreme examples of the judiciary's lack of capacity to evaluate government action. The prime risk taken by the government was the policy decision to undertake a "crash" program to provide fertilizer for war-torn countries by using a very unstable, explosive material. A court or jury should not be delegated the function of determining whether this decision was reasonable. Obviously, the decision of the

government had to be based upon an assessment of such factors as time, expense, necessity, etc.

The complaint in the instant case charges:

"That at said time and place, the defendants, and each of them, were negligent in one or more of the following particulars:

"(a) In designing, planning and maintaining a junction of said highways that reasonably causes the operator of a motor vehicle, and in particular the operator of a motor vehicle in which the deceased was a passenger:

"(1) To be unable to reasonably observe the west turn from Highway 74 onto Highway 30 and,

"(2) To continue in a northerly direction on an extension of Highway 74 that is of similar surface, width, marking and construction and,

"(3) To observe 'Dead End' signs on the extension of Highway 74, and

"(4) To observe three (3) reflector posts on the Highway 74 extension that indicate straight highway ahead rather than a curve to the right, and

"(5) To be unable to see anything but a void and empty space in the then northerly direction of travel;
all of which would and did reasonably cause said operator to become immediately confused, misled and uncertain as to his safety and to apply the motor vehicle brakes and go over the embankment aforesaid.

"(b) In failing to place a guard rail on the left or northerly edge of the curved extension of Highway 74.

"(c) In failing to post an indicator of the west turn onto Highway 30 within slowing distance of such turn.

"(d) In posting signs indicating the route to westerly traffic on Highway 30 was reached by

continuing straight ahead on Highway 74 and the extension thereof.

"(e) In failing to post a 'SLOW' warning sign for Highway 74 traffic proceeding north at said junction and intending to go west on Highway 30.

"(f) In cluttering Highway 74 at said junction with numerous misleading and non-directional traffic signs.

"(g) In failing to post warning of the sharp curve to the right on said extension of Highway 74.

"(h) In posting the arrow indicator sign to turn west onto Highway 30 within approximately four (4) car lengths of such turn.

"(i) In providing a left turn off Highway 74 to Highway 30 west at the end of a mile, more or less, of straight highway, which turn was unbanked, without a turning radius and turned greater than 90 degrees to the left within one (1) car length.

"(j) In failing to provide lighting for said junction.

"(k) In providing white painted 'center stripe' marking on Highway 74 at said junction that indicates continued 'straight ahead' approach to Highway 30 West.

"(l) In failing to erect and maintain numerous reflectors to indicate the sharp right turn on the Highway 74 extension.

"(m) For failing to post a large easily and readily observable 'arrow indicator' warning sign of the said left turn to Highway 30 West and to do so in such a manner and in such a position on Highway 74 that reasonable preparations could be made to safely slow the motor vehicle and turn left to Highway 30 West.

"(n) There was no uniformity in the size, shape, color or placement of said left turn 'arrow' signs with other signs at other similar junctions or intersections throughout the State of Oregon."

■ These allegations charge conduct by the executive branch of the government which should not be reviewed by the judicial branch. The decisions that were made to do or not to do these things appear to have been dependent upon considerations that a court or jury should not consider, particularly by hindsight, such as the funds available for the project, the amount of additional land necessary to make a more gradual curve, the cost of the land, the loss of the land for recreational or agricultural purposes, the amount and kind of traffic contemplated, the evaluation of traffic and safety technical data, etc.

■ We hold that state employees are generally immune from liability for alleged negligence in planning and designing highways.

We have used the term "generally immune" in the realization that it is conceivable that a complainant could allege and prove a defect in design or planning that could adequately and appropriately be passed upon by a judge or jury, for example, ludicrous for the sake of clarity, a road designed so that it ended at the edge of a cliff. We do not construe the allegations in this complaint as alleging this type of negligent design.

The complaint in VII (a) charges the defendants with negligence not only in the designing and planning of the junction but with negligence in "maintaining" the junction. Because of the context in which "maintaining" is used, we find it obvious that the plaintiff is using "maintaining" in the sense that the defendants continued in effect the junction as planned and designed, including the planned and designed safety precautions or lack of safety precautions. Plaintiff is not using "maintain" to mean keeping in a state of repair.

For these reasons the charge against the defendants for the manner in which they "maintain" the junction does not add anything to the charge of faulty "designing and planning."

■ We realize we are construing pleadings and not interpreting proof and we judge the sufficiency of the pleadings by what proof can be introduced in support of the pleadings. However, when a pleading has been attacked and the pleader chooses to stand on his allegations, the pleadings are construed most strongly against the pleader. *Medford v. Pac. Nat'l Fire Ins. Co.*, 189 Or 617, 628, 219 P2d 142, 222 P2d 407, 16 ALR2d 1181 (1950).

In *Ogle v. Billick*, 253 Or 92, 453 P2d 677 (1969), the plaintiff alleged that the county engineer was negligent "[i]n grading the aforesaid county roadway down so low below the aforesaid stairway so as to create a dangerous condition for those using said stairway." 453 P2d at 680. We held that we could not determine from the pleadings whether this alleged conduct was in the engineer's performance of a discretionary function. Taken literally, such allegation creates the image that the engineer, on the scene, directed the grader operator to cut below the bottom of the stairway. If that were the proof, the issue of negligence is of a type that a jury or judge constantly decides. The considerations involved in deciding such an issue of negligence are substantially different than those involved in deciding whether a curve is too tight or what traffic warning signs are appropriate.

The trial court was correct in granting the motion.

Affirmed.

SLOAN, J., dissenting.

Assuming that the rationale of the majority opinion is correct in its attempt to solve the impossible distinction between discretionary and non-discretionary functions, it seems to me that the complaint does allege a cause of action of non-discretionary acts. The complaint is capable of being read to allege that defendants created a death trap and had reason to be aware of the hazard. The evidence may not sustain the allegations but the complaint does state a cause of action. The majority assume facts not alleged in order to reach the contrary result. A decision of this consequence, in its impact on the Oregon Tort Claims Act, ORS 30.260 et seq. should not be based on assumption of fact.