Argued and submitted March 8; decision of Court of Appeals reversed, judgment of circuit court reversed, and case remanded to circuit court for further proceedings July 28, 2022

Thomas LOWELL,
*Petitioner on Review,*

*v.*

MEDFORD SCHOOL DISTRICT 549C,
*Respondent on Review,*
*and*

Stephanie MALONE et al.,
*Defendants.*

(CC 18CV19782) (CA A173221) (SC S068891)

515 P3d 359

Plaintiff, a school-concert volunteer and independent contractor for the school district, brought a defamation action against defendant, the school district, based on allegedly defamatory statements made by the district's employees. Defendants moved for summary judgment, asserting the common-law defense of absolute privilege. The trial court granted the motion, concluding that the absolute privilege protected statements by executive branch employees made within the course and scope of their duties and that the district was immune from suit because its employees could claim the privilege. Plaintiff appealed, and the Court of Appeals affirmed, concluding, based on its interpretation of *Shearer v. Lambert*, 274 Or 449, 547 P2d 98 (1976), that all public employees making statements within the course and scope of their employment could claim absolute privilege for those statements, even if those statements were made with malice, ill-will or spite, protecting them from liability for defamation claims. *Held*: (1) *Shearer*'s holding and reasoning do not compel the result that all public employees acting within the course and scope of their employment enjoy an absolute privilege in defamation claims; (2) not all public employees acting within the course and scope of their employment are entitled to claim the absolute privilege; (3) defendant's employees were not entitled to claim the absolute privilege.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

En Banc

On review from the Court of Appeals.*

_____

* On appeal from Jackson County Circuit Court, David G. Hoppe, Judge. 313 Or App 599, 497 P3d 797 (2021).

Linda K. Williams, Linda K. Williams PC, Portland, argued the cause and filed the briefs for petitioner on review.

Rebekah R. Jacobson, Garrett Hemann Robertson PC, Salem, argued the cause and filed the brief for respondent on review.

WALTERS, C. J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

## WALTERS, C. J.

In this defamation case, we hold that defendant public employer does not have an affirmative defense of absolute privilege that entitles it to summary judgment.

### I.   BACKGROUND

Because the trial court granted defendant's motion for summary judgment, we recount the facts in the light most favorable to plaintiff, the nonmoving party. ORCP 47 C.

Plaintiff provided piano tuning services to defendant Medford School District and assisted in producing concerts performed in defendant's facilities. While providing production assistance for a particular concert, plaintiff noticed an echo near the stage. He complained to the school theater technician, Malone, and, later, feeling that Malone had not adequately responded, he followed up with her. Malone reported to her supervisor, Bales, that plaintiff appeared to be intoxicated, that he "smelled of alcohol," and that "this was not the first time." Bales repeated Malone's statements to Armstrong, a district support services assistant. Armstrong sent emails summarizing Malone's statements to three other district employees, including the supervisor of purchasing. Armstrong expressed concerns that appearing on district property under the influence of alcohol violated district policy and the terms of plaintiff's piano tuning contract.

Plaintiff brought this defamation action against Malone, Bales, and Armstrong, alleging that the statements that they had made were defamatory. Those three individuals are employees of defendant, a public entity, and the court substituted defendant for the individual defendants. ORS 30.265(3).

Defendant answered, asserting multiple affirmative defenses, including the one at issue here, *viz.*, that public employees are entitled to an absolute privilege for defamatory statements made in the course and scope of their employment.[1] Defendant alleged that, because its employees

---

[1] In its answer, defendant also asserted a "qualified privilege"—as well as an "absolute privilege"—as an affirmative defense to plaintiff's defamation claims.

were entitled to that absolute privilege, it too was immune from liability. *See* ORS 30.265(5) (public bodies are immune from liability for any claim arising from actions of officers, employees, or agents who are immune).

Defendant moved for summary judgment on the absolute privilege defense, and plaintiff filed a corresponding motion for partial summary judgment, arguing that defendant was not entitled to immunity because the accused employees were "low level employees performing ministerial tasks," who were not entitled to an absolute privilege. The trial court agreed with defendant that "[t]he alleged defamatory statements were made by public officials in the course of their official duties and they were entitled to absolute privilege."

Plaintiff appealed, and the Court of Appeals affirmed, relying on its prior interpretation of this court's decision in *Shearer v. Lambert*, 274 Or 449, 547 P2d 98 (1976). *Lowell v. Medford School Dist. 549C*, 313 Or App 599, 602-05, 497 P3d 797 (2021). In a series of cases, the latest of which was *Christianson v. State of Oregon*, 239 Or App 451, 459, 244 P3d 904 (2010), the Court of Appeals had interpreted *Shearer* as holding that "an employee of an executive agency has an absolute privilege to make defamatory statements in the exercise of official duties, even if the statements were malicious and the person who made the statements is a lower-level employee."

We allowed plaintiff's petition for review to take our own look at *Shearer* and to consider whether the absolute privilege extends to all public employees, including defendant's employees, and, thereby, to defendant.

## II.   ANALYSIS

In this court, the parties reprise the arguments that they made below. Defendant contends that the Court of Appeals was correct in its interpretation of *Shearer* and that this court already has decided that the absolute privilege extends to all public employees acting within the

However, defendant's motion for summary judgment was predicated only on its claim of absolute privilege, and that is the only issue before us. We briefly discuss the differences between absolute and qualified privilege below.

course and scope of their employment. Defendant argues that we must adhere to that interpretation of *Shearer*, or, alternatively, that we should endorse that development in the Court of Appeals' case law as the correct understanding of the absolute privilege. Defendant does not argue that, if the absolute privilege extends only to "officers," then the individual employees in this case are officers entitled to claim it. Plaintiff reads *Shearer* as extending the absolute privilege only to state "officers" and argues that defendant's employees do not fit that description. Plaintiff urges that we not further extend the absolute privilege to all public employees.[2]

Because the parties' arguments focus on this court's decision in *Shearer*, we describe it and the common-law basis for our decision in that case in some detail. In *Shearer*, the plaintiff, an assistant professor at Oregon State University, brought a defamation action against plaintiff's department head for sending a letter to other faculty members describing alleged conversations between the department head and various students. 274 Or at 451. The department head asserted absolute privilege as a defense. *Id.* at 452.

This court began its analysis with the following description of the underpinnings of the defense:

> "Underlying the rule of absolute privilege is the assumption that to permit suits against public officers would inhibit courageous and independent official action, and the further assumption that the public interest thus served outweighs the interest of persons damaged by the willful and malicious conduct of public officers."

*Id.* The court remarked, without citation, that it had "frequently been called upon to choose between those competing interests in cases involving the conduct of judicial, legislative and executive officers in various levels of authority in

_____

[2] The parties appear to assume that defendant is an executive agency and that its employees are employees of an executive agency. Plaintiff does not mount an argument that defendant school district is not a state agency or that its employees cannot be considered "executive branch officials." Because we reject defendant's claim that all public employees are entitled to claim the absolute privilege, we need not consider whether officers of local entities are entitled to the privilege that executive branch officers, such as the department head in *Shearer*, can claim.

each of these branches of government." *Id.* at 452-53. The court then continued:

> "In rendering our decisions in these cases we have not overlooked the arguments advanced by the critics of the doctrine of absolute privilege. However, although there is no data which indicates one way or the other whether the recognition of an absolute privilege is necessary to assure fearless action on the part of public officers, we think that the privilege is necessary and therefore, if provision is to be made to compensate persons harmed by official action, it will have to be through some other kind of remedy which still preserves the privilege."

*Id.* at 453 (footnote omitted).

The court then set out the issue as it saw it: "the applicability of the privilege to various types of governmental officers at various levels of authority or importance." *Id.* at 454. The court noted that it had "extended the absolute privilege to judicial and quasi-judicial officers at all levels" and recently held "that the privilege was applicable to subordinate legislative bodies[.]" *Id.* It then observed that the cases in other jurisdictions were in conflict and that some other jurisdictions had limited the executive absolute privilege to highly ranked government officials, *e.g.*, the state's governor or attorney general, while others had extended the privilege to "inferior state officers no matter how low their rank or standing." *Id.* at 454. The court reasoned:

> "Although we would prefer to confine the absolute privilege to its narrowest possible application, we feel compelled to adopt the latter view because, starting with the premise that the privilege is designed to free public officers from intimidation in the discharge of their duties, we are unable to explain why this policy would not apply equally to inferior as well as to high-ranking officers."

*Id.*

Having set out its reasoning, the court then stated its holding as follows: "We hold, therefore, that an absolute privilege exists in an action brought against the head of a department of a state university." *Id.* The court also included, just before its holding, a footnote that reads:

> "The privilege does not apply, however, where the tort arises out of the exercise of a 'ministerial' function. The difficulty of drawing the line between 'ministerial' and 'discretionary' functions again suggests the need for legislation which would provide relief under a principle which would render the distinction unnecessary."

*Id.* at 454 n 9. Finally, the court disposed of the case, determining that, although the department head could claim absolute privilege, summary judgment was inappropriate because factual questions remained. The defendant was entitled to absolute privilege only if his defamatory statements were made in the performance of his duties, and, on that issue, the facts were contested. *Id.* at 455.

Both parties take succor from the court's opinion. Defendant contends that the court adopted the broad application of the absolute privilege available in other states and made it applicable to all public employees, no matter the level of position they hold. Plaintiff concedes that the court extended the absolute privilege beyond the very highest officers in the state but contends that its holding was limited to the facts presented in that case.

To better understand *Shearer*'s reach, we find it helpful to review the state of the law of defamation and the defense of absolute privilege in 1976 when the court issued its opinion in that case.

A.  *Common-Law Origins and Development in the State Courts*

Defamation is a common-law claim that was recognized in England and, with its affirmative defenses, ported over to this country around the time of its founding. *See generally*, Van Vechten Veeder, *Absolute Immunity in Defamation Judicial Proceedings*, 9 Colum L Rev 463 (1909). The absolute privilege in legislative proceedings, *i.e.*, the rule that members of Parliament could not be sued for remarks that they made on the Parliamentary floor, had existed in English common law since at least 1512. Van Vechten Veeder, *Absolute Immunity in Defamation Legislative and Executive Proceedings*, 10 Colum L Rev 131, 132 (1910). In the United States, the Founders similarly

protected members of Congress from liability for statements made on the House or Senate floor. US Const, Art I, § 6, cl 1. The absolute privilege in judicial proceedings, *i.e.*, the rule that witnesses, judges, parties, and parties' counsel were protected from liability for statements that they made during judicial proceedings, existed in English common law since the sixteenth century. Veeder, 9 Colum L Rev at 474. In the United States, it appears that state courts imported the English common-law privilege from a very early period and applied it mostly as English courts had. *See id.* at 475 (citing state cases from the mid-nineteenth century applying the absolute privilege to jurors).

An absolute privilege for high-ranking executive officers, such as the United States Postmaster General, seems to have come to prominence towards the end of the nineteenth century in both England and the United States. *Spalding v. Vilas*, 161 US 483, 16 S Ct 631, 40 L Ed 780 (1896); *see also Chatterton v. Secretary of State for India* [1895] 2 QB 189 (statement made by the Secretary of State for India to another executive official was absolutely privileged); Veeder, 10 Colum L Rev at 140 (citing cases on the executive absolute privilege beginning in the 1870s). At that time, the absolute privilege extended only to very high-ranking government officials, *i.e.*, cabinet-level government actors. A leading scholar in 1910 put the then-current rule this way: "[Executive absolute privilege] is confined to official communications from the heads of departments in which the head of the department speaks for the government or as its mouthpiece. It has not been extended to inferior officers." *Id.* at 141.

Thus, the basis for the application of the absolute privilege developed differently based on the branch of government in which the communication occurred. When applied to speakers in the legislative and judicial branches, communication was protected when made in particular proceedings, not when made by persons serving in particular positions. Thus, in judicial proceedings, communications by witnesses are protected, not because the witnesses are employees of the judicial branch, but because it is essential that they provide testimony in such proceedings. When speaking occurs

in proceedings or is necessary to proceedings, the thinking goes that all levels of speakers, from judges and legislators, to witnesses and complainants, should be entitled to an absolute privilege. It is the value and importance of the proceeding itself that the absolute privilege protects. *See* Dan B. Dobbs, Paul T. Hayden, & Ellen M. Bublick, 3 *The Law of Torts* § 540, 244 (2d ed 2011) (explaining that "the privilege also covers witnesses or citizen participants at legislative hearings, in order to secure citizen participation in the political process that will more fully inform legislators" and that that is "supported when the proceeding has a formal character and procedural safeguards and when the witness is subpoenaed or gives testimony under oath" (footnote omitted)); Veeder, 9 Colum L Rev at 469 (explaining that "[i]t is essential to the ends of justice that all persons participating in judicial proceedings (to take a typical class for illustration) should enjoy freedom of speech in the discharge of their public duties or in pursuing their rights without fear of consequences").

Communication in the executive branch does not necessarily occur in the same types of structured proceedings, and thus, its importance to effective governance is less apparent. As put in Dobbs, *The Law of Torts* § 541 at 244-45:

> "The executive branch, including police, administrators at all levels, and most other governmental employees, is quite different from the judicial and legislative branch. Except in quasi-judicial proceedings where the absolute judicial privilege would apply, employees in the executive branch do not regularly operate in structured forums like the Congress or the judiciary; they are not often subject to institutional, professional, or even regular political constraints; and they seldom if ever have need of privileges not enjoyed by the citizens they are obliged to serve. *** Apart from statute, executive branch employees were not traditionally afforded the same broad and absolute immunity granted to employees in the judicial and legislative branches."

Accordingly, when applied to speech in the executive branch, the absolute privilege was confined to official communications from the heads of departments in which the head of the department spoke for the government or as its mouthpiece.

Over time, most states retained that narrow conception of the executive branch privilege and applied it only to high-ranking government officers. However, a minority expanded the executive absolute privilege to apply to "lower-level" officials. In the year following *Shearer*, a leading treatise described the state of the law this way:

"While there are a few state court decisions which appear to [apply the absolute privilege to] subordinate state officers, such courts in general have refused to accept the extension, and have recognized no absolute privilege on the part of such officers as superintendents of schools, mayors and aldermen, prosecuting attorneys and policemen, state investigators, and the like. Unless such an executive officer can claim immunity on the basis of a quasi-judicial or legislative function, he is held to be subject to qualified privilege only."

W. Page Keeton, Dan B. Dobbs, Robert E. Keeton, & David G. Owen, *Prosser and Keeton on the Law of Torts*, § 114, 822 (5th ed 1984) (footnotes omitted); *see also*, *Restatement (Second) of Torts*, § 591 comment c (1977) ("A good number of the States have gone further, and have extended the absolute privilege to state officers of various ranks below that of cabinet level. The greater number of the state courts have not made the extension * * * and some have expressly confined the absolute privilege to superior officers of the States.").

B.   *The Absolute Privilege in Oregon Before* Shearer

In Oregon, the absolute privilege developed along a similar track. The absolute privilege for state legislators is enshrined in the state constitution. Article IV, section 9, of the Oregon Constitution provides, in relevant part, "Nor shall a member for words uttered in debate in either house, be questioned in any other place."

The absolute privilege in judicial proceedings protects statements made by judges in such proceedings. *See Irwin v. Ashurst*, 158 Or 61, 66, 74 P2d 1127 (1938) (explaining that "[i]t is well settled in England and in this country, on the ground of public policy, that a judge has absolute immunity from liability in an action for defamatory words published in the course of judicial proceedings"). And

witnesses testifying in such proceedings also are entitled to an absolute privilege. *See Cooper v. Phipps*, 24 Or 357, 358, 366, 33 P 985 (1893) (holding that absolute privilege protected the testimony of a witness made during a divorce trial).

In 1955, this court considered whether to make the absolute privilege in judicial proceedings applicable outside the courtroom itself. In *Grubb v. Johnson et al*, 205 Or 624, 626-27, 289 P2d 1067 (1955), the plaintiff sued his former employer for statements that the company had made in a letter that it had sent to a state agency instructing the agency to revoke the plaintiff's sales license because the plaintiff had embezzled money from the company. The company asserted the absolute privilege, arguing that the letter was part of a quasi-judicial proceeding. *Id.* at 640. The court disagreed, reasoning that the revocation process was not sufficiently like a judicial proceeding to make the application of the absolute privilege appropriate. The revocation process did not permit the agency to exercise discretion; revocation was automatic and mandatory upon receipt of the letter. *Id.* at 640-41.

The court reached a different conclusion four years later in *Ramstead v. Morgan*, 219 Or 383, 401, 347 P2d 594 (1959). There, the court determined that complaints about a lawyer in a letter sent to the Oregon State Bar were protected by a "quasi-judicial" absolute privilege. *Id.* at 396. The court reasoned that extension of the privilege was necessary to protect the public and explained that those who might lack the resources necessary to perfectly present their grievances should not have to face the threat of liability for making complaints about lawyer misconduct. *Id.* at 400-01. *Accord Moore v. West Lawn Mem'l Park*, 266 Or 244, 250-51, 512 P2d 1344 (1973) (absolute privilege applied to letter written to the State Board of Funeral Directors and Embalmers with quasi-judicial function as a licensing body; *Grubb* did not control because the board had discretion about whether to revoke the license).

In 1975, this court extended the absolute privilege in legislative proceedings to proceedings in addition to those conducted on the floor of the House and Senate. In *Noble v.*

*Ternyik*, 273 Or 39, 539 P2d 658 (1975), the court held that the absolute privilege applied to a statement that a member of a port commission made in a commission meeting because:

> "Uncompensated citizens, serving at least in part to fulfill their civic responsibility, comprise the vast bulk of numerous legislative bodies in Oregon. Port commissions, city councils, school boards, and special service districts are some of these bodies. Oregon prides itself on its citizen participation. These bodies make economic, social, educational, and other important decisions. This system will function only if capable people are willing to serve on these bodies.
>
> "We are of the opinion that a substantial number of capable people would be reluctant to serve if their statements, made in the course of their legislative duties, were only conditionally privileged \*\*\*.
>
> "We are also of the opinion that persons who would be willing to serve would be hesitant to bring information to the attention of their legislative bodies if the publication of this information were only conditionally privileged."

*Id.* at 43-44.

Thus, when *Shearer* reached this court in 1976, the state of the law of absolute privilege in Oregon, with respect to governmental proceedings or actors, was that there were three types of absolute privilege: (1) legislative absolute privilege, (2) judicial absolute privilege, and (3) absolute privilege for "other acts of state," *i.e.*, executive absolute privilege. *Grubb*, 205 Or at 631. As the court said in *Grubb*:

> "The class of absolutely privileged communications is narrow and is practically limited to legislative and judicial proceedings and other acts of the state, including, it is said, communications made in the discharge of a duty under express authority of law, by or to heads of executive departments of state, and matters involving military affairs."

*Id*. (internal quotation marks and citation omitted). Legislative and judicial proceedings included local proceedings and quasi-judicial proceedings. The court had extended the absolute privilege to communications made in such proceedings

to protect the public and ensure essential participation and the provision of important information.

C.   *Shearer's Reach*

With that understanding of the law at the time of *Shearer*, we return to its holding and consider whether, as defendant argues, the court held that all public employees are entitled to claim the absolute privilege as long as they operate within the course and scope of their duties. As noted, the court started with the premise that the privilege is designed to free public officers from intimidation in the discharge of their duties and noted that it had "extended the absolute privilege to judicial and quasi-judicial officers at all levels." *Shearer*, 274 Or at 454. The court then stated that it was unable to explain why that policy would not apply equally to inferior as well as to high-ranking officers, and stated its holding—that the defendant, a university department head, was entitled to claim the absolute privilege. *Id*.

For the following reasons, we conclude that neither that reasoning nor that holding require us to agree with defendant that, under *Shearer*, *all* public employees have an absolute privilege to make defamatory statements in the course and scope of their duties, even when they do so with malice, ill will, or spite.

First, in *Shearer*, the court did not state its holding in those terms. After reasoning as described, the court expressly stated its holding as follows: "We hold, therefore, that an absolute privilege exists in an action brought against the head of a department of a state university." *Id*.

Second, the court did not expressly hold that the absolute privilege is available to "inferior officers" or define that term. Even if *Shearer* can be understood to extend the privilege to state executive "officers," it cannot be understood to extend the privilege to all public employees.

Third, the court inserted a footnote, quoted above, that made clear that it did not intend to extend the absolute privilege to all public employees acting within the course of their duties. The footnote specifies that the absolute privilege is not intended to apply to actors who perform

"ministerial" tasks; it applies only to those who perform "discretionary" functions, and only when they are perform-ing such functions. *Id.* at 454 n 9.[3] In using those terms, the court used wording found in the Oregon Tort Claims Act (OTCA), waiving sovereign immunity. At the time that *Shearer* was decided, the OTCA provided:

> "Every public body is immune from liability for:
>
> "* * * * *
>
> "(d)   Any claim based upon the performance of or the failure to exercise or perform a *discretionary function* or duty, whether or not the discretion is abused."

*Former* ORS 30.265(2)(d) (1975)[4] (emphasis added). The court also had recently decided *Smith v. Cooper*, 256 Or 485, 475 P2d 78 (1970). In *Smith,* the court had considered whether the doctrine of sovereign immunity protected the State Highway Commission from an action brought by the plain-tiff alleging negligence in highway planning. The court devoted a substantial part of the opinion to the question of whether designing the highway was a ministerial function (in which case sovereign immunity would not apply) or a discretionary one (in which case sovereign immunity would apply). *Id.* at 495-512. Thus, the "ministerial" and "discre-tionary" distinction would have been a familiar concept for the *Shearer* court to draw on. Significantly, however, we do not think that the court intended to import the law of sovereign immunity generally into the absolute privilege analysis. *See Noble*, 273 Or at 41 (explaining that although "[c]ourts have intermingled the terminology of privilege, a part of the law of defamation, and immunity[,] *** [t]here is at least a theoretical difference"). A better understanding of the footnote is that the court was using a familiar con-struct to articulate its intent to adhere to the purpose that

---

[3] As noted above, the footnote reads:

"The privilege does not apply, however, where the tort arises out of the exer-cise of a 'ministerial' function. The difficulty of drawing the line between 'ministerial' and 'discretionary' functions again suggests the need for legis-lation which would provide relief under a principle which would render the distinction unnecessary."

[4] This statute has been amended several times since 1975, however, none of those amendments is material to our discussion here.

underlies both the common-law defense of absolute privilege and the legislature's limited waiver of sovereign immunity: that those making important governmental decisions requiring the exercise of judgment be assured that they can do so "fearlessly." The court's footnote made clear that it did not intend to extend the absolute privilege to all public employees without bounds.

Finally, the court in *Shearer* plainly did not view its earlier extension of the absolute privilege to *proceedings* broader than those in the Capitol and the courts, as requiring it to extend that privilege to all who serve in legislative, judicial, and executive *positions*. In *Shearer*, the court noted that it had "frequently been called upon" to choose between competing interests "in cases involving the conduct of judicial, legislative and executive officers in various levels of authority in each of these branches of government." 274 Or at 452-53. The court did not cite cases for that proposition, however, and although we have looked, we have been unable to find cases before *Shearer* that meet that description, particularly for the executive branch of government. As discussed, the court's earlier cases extended the absolute privilege to a broader range of *proceedings*; those cases did not extend the absolute privilege in defamation claims to communications by officers in a broader range of positions. And, with respect to the executive branch, we are not aware of earlier cases in which the court discussed the application of the privilege in the executive branch in any detail.

For those reasons, we read *Shearer* to stand for the proposition that the absolute privilege applies when the public's interest in functioning government is so great that it outweighs an individual's interest in redress for reputational harm, and to hold that, in the case of a university department head, the public interest is paramount. We reject defendant's argument that *Shearer* compels us to decide that the absolute privilege defense to a defamation claim extends to all public employees, including defendant's employees here, as long as they act within the course and scope of their employment.

Defendant also argues that, even if *Shearer* does not compel us to do so, we should accept an approach that

makes the absolute privilege available to all public employees, reminding us that, to claim that privilege, employees must establish that they are acting within the course and scope of their duties. Defendant submits that that requirement makes the defense sufficiently narrow, providing both adequate redress to plaintiffs and protection from undue harassment to public employees. We reject that argument.

Defendant is correct that this court conceives of the absolute privilege as narrow in scope. Since *Shearer*, this court has maintained, as it stated in *Grubb*, that the absolute privilege is "narrow" and applies in "only a handful of situations." *See Wallulis v. Dymowski*, 323 Or 337, 348, 918 P2d 755 (1996) ("Oregon has recognized only a handful of situations in which defamatory statements are absolutely privileged."); *DeLong v. Yu Enterprises, Inc.*, 334 Or 166, 171, 47 P3d 8 (2002) ("Historically, this court has recognized the application of an absolute privilege for defamatory statements in very limited circumstances."). Defendant is incorrect, however, in urging that that privilege can be extended to all public employees who make defamatory statements in the course of performing their duties, including those who do so with malice, without upsetting the balance of competing interests on which the absolute privilege rests. Protecting public employees from harassment is not the policy end for which the absolute privilege is designed. Protecting public employees, is, instead, a *means* to ensure good governance by fearless officials. As New York state's highest court put it when it refused to broaden the applicability of the privilege: "[T]he immunity is intended for the welfare of the public and not for governmental employees." *Stukuls v. State*, 42 NY 272, 278, 366 NE2d 829, 833, 397 NYS2d 740, 744 (1977).

This court has recognized an absolute privilege as an affirmative defense to defamation claims, understanding that it might bar some meritorious claims; this court has done so, however, only when it deems the privilege essential to effective governance. We will not extend the absolute privilege when that purpose is not necessarily implicated. As the Kentucky Court of Appeals said in 1910, when it refused to extend the absolute privilege to a school superintendent:

> "It would be a dangerous and vicious thing to license people to write and speak without any restraint. There are many evil-minded and recklessly disposed who would shelter if they could under the protection afforded by absolute privilege and give free bridle to tongue and pen to injure or destroy an enemy. It would place in the power of revengeful and unscrupulous persons the right to malign at will those who had incurred their displeasure, and allow the traducer to scatter without stint scandalous and defamatory matter about all who might come within the circle of his enmity."

*Tanner v. Stevenson*, 138 Ky 578, 585, 128 SW 878, 881 (1910). In reaching that conclusion, we, like other jurisdictions to consider the scope of the absolute privilege, emphasize that its remedy is potent: It protects a defendant not just from being held liable at the conclusion of a trial; it prevents a plaintiff from reaching a trial at all. *Wallulis*, 323 Or at 347. Another common-law defense in defamation actions, a qualified privilege, is available for defendants who must defend the action, but who can defeat it if the plaintiff fails to establish that the defendant abused the privileged occasion. *Id.* at 348. Some state courts that have been asked to extend an absolute privilege to lower-level executive branch speakers have decided that a qualified privilege is sufficiently protective. *See Bradford v. Mahan*, 219 Kan 450, 455, 548 P2d 1223, 1228-29 (1976) (refusing to extend absolute privilege to police officers and stating that "[t]he police should never act with malice or ill will against the citizens of this state without being called to account for their actions," and "[a] qualified privilege will sufficiently insulate police officers and insure the vigorous enforcement of the law"); *Stukuls*, 42 NY at 278, 366 NE2d at 833, 397 NYS2d at 744 (concluding that qualified privilege would adequately protect lower-level officials because "to cloak public officers who do not have such a need with the privilege to wrongfully vilify others with impunity while their critics remain fully liable for their own tortious communications[] would tend to squelch criticism of government by its citizens while serving no sufficiently countervailing public purpose").

In summary, we reject defendant's argument that we already have extended or should extend the absolute privilege to all public employees acting within the course

and scope of their duties. As noted, defendant does not argue that it is entitled to the benefit of that defense because its employees are "officers" equivalent to the university department head in *Shearer*. Consequently, defendant was not entitled to claim the affirmative defense of absolute privilege, and the trial court erred in granting it summary judgment on that basis.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.