Argued and submitted May 21,
reversed and remanded October 27, 1980

# DUNDAS,
## *Appellant,*
### *v.*
# LINCOLN COUNTY,
## *Respondent*
## (No. 78-3694, CA 14786)

618 P2d 978

James W. Walton, Corvallis, argued the cause for appellant. With him on the briefs were Robert G. Ringo, and Ringo, Walton, Eves & Gardner, P.C., Corvallis.

I. Franklin Hunsaker, Portland, argued the cause for respondent. With him on the brief were Ronald E. Bailey, and Bullivant, Wright, Leedy, Johnson, Pendergrass & Hoffman, Portland.

Before Joseph, Presiding Judge, and Warden and Warren, Judges.

WARREN, J.

.

## WARREN, J.

Plaintiff[1] brought an action against defendant Lincoln County for damages which occurred when four horses owned by plaintiff were destroyed by fire while stabled in a barn at the Lincoln County Fairgrounds. After plaintiff rested, the trial court granted defendant's motion for a judgment of involuntary nonsuit. Plaintiff assigns this ruling as error. We reverse.

In reviewing a judgment of involuntary nonsuit, we view the evidence in the light most favorable to plaintiff. *Kirby v. Sonville,* 286 Or 339, 342, 594 P2d 818 (1979). As so viewed, the evidence shows, in pertinent part, as follows: Plaintiff, an owner and experienced trainer of horses, had four horses stabled in the "old barn" at the fairgrounds at the time of the fire. The fire occurred August 2, 1977, shortly after the closing of the county fair, which was held the third weekend in July. Prior to the start of the fair, three of plaintiff's horses had been stabled in the "new barn" or livestock barn at the fairgrounds. Because the livestock barn was needed for 4-H exhibits during the fair, the Fair Board[2] posted notices that all horses stabled in the livestock barn should be moved to the old barn or they would be removed. This procedure was followed by the Fair Board each year, and plaintiff had in previous years moved horses under the same circumstances.

The old barn, which was over 20 years old, was used only for the short period each year when due to the fair the livestock barn was not available for stabling horses. Measuring approximately 90 feet by 54 feet, it was a single wall structure made primarily of wood. The roof was shiplap construction with coats of tar. There was no flooring in the barn. Straw and wood chips were used for bedding, and hay was stored in

---

[1] The proceedings below involved consolidated actions brought against defendant by several plaintiffs. Only plaintiff Carol Dundas has appealed from the amended judgment of involuntary nonsuit entered by the trial court.

[2] *See* ORS 565.210 *et seq.* for the organization, authority, and duties of county fair boards.

lofts above some of the stalls. At each end of the barn was a dry chemical fire extinguisher and a water fire extinguisher. The building had no automatic sprinkler system, fire alarm system, or smoke or heat detectors. There was no telephone in the barn. Although there had previously been a canvas fire hose in the old barn, it had deteriorated and had never been replaced. Plaintiff paid $20 per month to stable each of her horses in the livestock barn. The county furnished bedding, water and electricity. Each horse owner was responsible for the care and feeding of his or her horses, and for the cleaning of the stalls. This arrangement was continued after the horses were moved to the old barn.

From approximately 6:00 or 7:00 a.m. until approximately 10:00 p.m. each day, the fairgrounds and barn were open for the horse owners and general public. At all other times, both the fairgrounds gate and the barn entrances were locked. The grounds manager and one horse owner, who was also a member of the Fair Board, were the only persons with keys to enter the grounds and barn at those times.

On the morning of the fire, a 13-year-old boy, whose parents had horses stabled in the old barn, was setting off caps in the barn when one burned him and he threw it backwards. He soon noticed a fire burning in the bedding of one of the stalls and attempted to put it out with the fire extinguishers in the barn. He "turned on the water, and it went for a couple of seconds, and it went out." When he tried to use the chemical extinguisher, it spread the fire more. He then ran to a nearby barn to use a telephone. Finding the barn locked, he was finally able to enter through a manure chute and call in an alarm to the fire department. By the time the fire-fighting equipment arrived, none of the horses in the barn could be saved.

Plaintiff's third amended complaint alleged that defendant was negligent in the following particulars:

"(1) The defendant knew, or should have known, that said building was a fire hazard and failed to take

reasonable measures to alleviate said condition or to warn plaintiff.

"(2) Defendant knew, or should have known, that said building was not equipped with an alarm system and had failed to take reasonable measures to alleviate this situation or to warn plaintiff.

"(3) Defendant knew, or should have known, that said building was not equipped with an adequate fire fighting system and had failed to take reasonable measures to provide adequate fire fighting equipment or to warn plaintiff that an adequate fire system was not available."

Plaintiff's theory of the case was that defendant was the bailee of her horses, with a common law duty to exercise reasonable care toward the bailed property. It was also plaintiff's contention that defendant had a ministerial duty to maintain the barn and adequate fire fighting equipment therein so that the barn would not be a fire hazard and failed to exercise reasonable care to do so.

As grounds for its motion for judgment of involuntary nonsuit, defendant argued that: (1) there was no proof that any negligence was attributable to defendant; (2) there was no proof of any causal relationship between any negligence of defendant and plaintiff's loss; (3) the evidence failed to show any breach by defendant of a ministerial duty, and defendant was, therefore, immune from liability for damages; and (4) the defendant was merely a lessor of space and owed plaintiff no common law or statutory duty to modernize the barn or to provide or maintain a fire alarm or fire fighting system. We first address the immunity question.

Under ORS 30.265(3)(c),[3] defendant is immune from liability for a claim based on the performance or the failure to perform a discretionary function. In *Smith v. Cooper,* 256 Or 485, 475 P2d 78 (1970), the

---

[3] ORS 30.265(3)(c) provides:

"(3) Every public body and its officers, employes and agents acting within the scope of their employment or duties are immune from liability for:

Supreme Court attempted to outline the characteristics of a "discretionary function":

> "The most decisive factor but one most difficult to articulate is that it is essential for efficient government that certain decisions of the executive or legislative branches of the government should not be reviewed by a court or jury. The reason behind such factor is that the bases for the legislative or executive decision can cover the whole spectrum of the ingredients for governmental decisions such as the availablility of funds, public acceptance, order of priority, etc." 256 Or at 506.

The court again attempted to describe "discretion" in *McBride v. Magnuson,* 282 Or 433, 578 P2d 1259 (1978):

> "* * * But not every exercise of judgment and choice is the exercise of discretion. It depends on the kind of judgments for which responsibility has been delegated to the particular officer. Discretion, as this court has noted in other contexts, involves 'room for policy judgment,' *Smith v. Cooper,* 256 Or 485, 502, 475 P2d 78, 45 ALR 3d 857 (1979), *quoting Dalehite v. United States,* 346 US 15, 36 (1953), or the responsibility for deciding 'the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued,' *Antin v. Union High School Dist. No. 2,* 130 Or 461, 469, 280 P 664 (1929). It involves the delegated responsibility for 'assessment and ranking of the policy objectives explicit or implicit in the statute' and for the judgment that one or more of these objectives will be served by a given action, *Dickinson v. Davis,* 277 Or 665, 673, 561 P2d 1019 (1977). In other words, insofar as an official action involves both the determination of facts and simple cause-and-effect relationships and also the assessment of costs and benefits, the evaluation of relative effectiveness and risks, and a choice among competing goals and priorities, an official has 'discretion' to the extent that he has been delegated

---

"* * * * *

"(c) Any claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused."

responsibility for the latter kind of value judgment."
282 Or at 436-37.

■　　　Central to defendant's decision whether to modernize the old barn so that it would be less prone to catch fire are considerations of the availability of public funds and evaluation of spending priorities. The same may be said of a decision whether to equip the barn with a fire alarm, automatic sprinklers, smoke or heat detectors, or telephones. Such a decision also requires a determination of the best means to assure fire safety and assessment of the likelihood of a fire. Under the criteria outlined above, defendant's decision on these matters was discretionary.

■　　　Plaintiff argues, however, that there was evidence that defendant negligently maintained the fire extinguishers and thus failed to exercise reasonable care in the performance of a ministerial duty. The trial court rejected this argument, reasoning that the allegations of the complaint did not adequately inform defendant that plaintiff was proceeding on this theory. We conclude that plaintiff's allegation that defendant "failed to take reasonable measures to provide adequate fire fighting equipment" is broad enough, in the absence of a motion to make more definite and certain, to include the nondiscretionary failure to maintain existing fire extinguishers. *See Wagner v. Portland,* 40 Or 389, 396-97, 67 P 300 (1902). *See also Antin v. Union High School Dist. No. 2,* 130 Or 461, 468, 280 P 664 (1929); *Comley v. State Bd. of Higher Ed.,* 35 Or App 465, 476-77, 582 P2d 443 (1978); *Baker v. State Bd. of Higher Ed.,* 20 Or App 277, 290, 531 P2d 716, *rev den* (1975).

The next question is whether defendant owed a common law or statutory duty to plaintiff to maintain the fire extinguishers. Resolution of this question requires an analysis of the relationship between defendant and plaintiff.

■　　　As noted above, plaintiff contends that a bailor-bailee relationship existed between plaintiff and defendant. A bailment has been defined as "a

delivery of something of a personal nature by one party to another, to be held according to the purpose or object of the delivery, and to be returned or delivered over when that purpose is accompolished." *Kantola v. Lovell Auto Co.,* 157 Or 534, 538, 72 P2d 61 (1937). In order for a bailment to exist, the bailee must have both possession and physical control. *Jackson v. Miller,* 41 Or App 669, 598 P2d 1255 (1979). In *Jackson,* the court stated:

> "* * * In the distinction between bailment, or possession, and mere custody, so-called, the element of intent to control and possess plays the leading part. Where the owner of goods places them in the actual physical control of another but does not intend to relinquish the right, as distinct from the power, of dominion over them, there is no bailment or possession but only a mere custody." 41 Or App at 672, *quoting* Brown, Personal Property § 10.4 at 223 (emphasis omitted).

In support of his characterization of the stabling arrangement as a bailment, plaintiff points to a general rule that the delivery of a horse to a livery stable keeper to be kept creates a bailment, and that the livery stable keeper is liable for the loss by fire of property left in his care where the loss is caused by the bailee's negligence. *See* 54 C.J.S., Livery-Stable Keepers §§ 13, 14. Plaintiff also cites cases finding a bailment where horses were left at a stable under an agreement whereby the horse owners paid the stable keeper for stabling the horse. *See Pinehurst, Inc. v. Schlamowitz,* 351 F2d 509 (4th Cir 1965); *Weick v. Dougherty,* 139 Ky 528, 90 SW 966 (1906). The issue must be resolved, however, not by resort to labels or general rules, but by examining the intent of the parties and the duties assumed by defendant.

> "* * * A bailment will not be implied where it appears that it was the intention of the parties, as derived from their relationship to each other and from other circumstances of the case, that the property was to be held by one party in some capacity other than as bailee." *Owen v. Bradley,* 231 Or 94, 103, 371 P2d 966 (1962).

In *Pinehurst, Inc. v. Schlamowitz, supra,* the defendant was a professional trainer of harness racehorses, who "accepts the general custody and care of horses owned by others, trains and exercises them and transports them from track to track in the East where he races them during the racing season." 351 F2d at 511. During the winter, the defendant stabled the horses in North Carolina. Thus, the defendant assumed the complete care and control of the horses entrusted to him. In *Weick v. Dougherty, supra,* plaintiff, a traveling salesman, was accustomed to leaving his wagon and horses at defendant's livery stable to be stored overnight. For plaintiff's convenience and at defendant's direction, the wagon would be placed nearer to the door than any other vehicle stored. In the mornings, defendant's employes would guide the wagon out to the street. Thus, it appeared that defendant assumed a degree of control over the wagon while it was in his stable.

■    In contrast, in the present case the evidence is uncontroverted that defendant did not expressly or impliedly contract to care for or exercise any control over plaintiff's horses. Plaintiff had full responsibility for the care and feeding of her horses and for the cleaning of the stalls. Defendant undertook only to supply bedding, water and electricity. Plaintiff had full access to her horses at all times when the fairgrounds and barn were open, and was free to remove her horses or substitute other horses in their stead.

The relationship between the parties here is analogous to that between the parties in *Reimers v. Petersen,* 237 Iowa 550, 22 NW2d 817 (1946), and *Zucker v. Kenworthy Bros.,* 130 NJL 385, 33 A2d 349 (1943). In *Zucker v. Kenworthy Bros.,* defendant, in the business of moving and hauling, rented space in its building to plaintiff for the storage of plaintiff's car. Plaintiff was furnished with a key to the building and removed the car when he chose without interference by defendant. Defendant performed no service on plaintiff's car. When plaintiff's car was destroyed by fire, plaintiff brought an action for damages against

defendant, contending that defendant was the bailee of the car. The court rejected this argument, holding that plaintiff was a lessee of space in the building. The court stated:

> "* * * In general it may be said that where personal property is left upon another's premises under circumstances from which either relation might possibly be predicated, the test is whether or not the person leaving the property has made such a delivery as to amount to a relinquishment, for the duration of the relation, of his exclusive possession, control, and dominion over the property, so that the person upon whose premises it is left can exclude, within the limits of the agreement, the possession of all others. If he has, the general rule is that the transaction is a bailment. On the other hand, if there is no such delivery and relinquishment of exclusive possession, and his control and dominion over the goods is dependent in no degree upon the cooperation of the owner of the premises, and his access thereto is in no wise subject to the latter's control, it is generally held that he is a tenant or lessee of the space upon the premises where the goods are left." 33 A2d at 350.

In *Reimers v. Petersen, supra,* which presented similar facts, the court also rejected the plaintiff's contention that a bailment was created and concluded that the contract was not for the care of a car but for a lease of space in a garage.

The following rule was stated in *Weddington v. Stolkin,* 106 NE2d 239 (Ind App 1952):

> "* * * The liability of a person, who, for a monetary consideration, permits another to park his car on his premises, for damages thereto, depends on whether a bailment is made, or whether merely space to park is leased. In deciding this question, the determining factor is usually whether or not possession and control is given to the owner of the premises. * * *
>
> "* * * * * *
>
> "* * * One who merely grants storage space without assuming, expressly or impliedly, any duty or responsibility with respect to the care and control of the property stored, is a landlord and not a bailee." 106 NE2d at 241-42.

Although the relationship between the parties may not be neatly compartmentalized into either a bailment or a leasehold, it is far more analogous to the latter. The fact that plaintiff was barred from access to her horses for several hours each day while the fairgrounds and barn were locked for security reasons does not alter the essential nature of the relationship, which was a lease by plaintiff of space in which to keep her horses.[4]

The significance of determination that the relationship between the parties was that of a lease, not a bailment, is that, subject to exceptions, a lessee takes the premises as he finds them.

> "In the absence of a controlling statute or ordinance a lessor is ordinarily not liable to his lessee for injuries caused by a dangerous condition which existed when the lessee took possession. To this general rule there are a number of exceptions, the principal one of which is to the effect that the lessor is subject to liability if he fails to disclose to his lessee a dangerous condition which is known to lessor but unknown to the lessee and which the lessor has reason to expect that the lessee will not discover." *Lapp v. Rogers,* 265 Or 586, 588, 510 P2d 551 (1973).

There was no evidence that defendant actually knew the fire extinguisher was inoperable.

■ At common law, in the absence of a provision in the lease imposing such an obligation, a landlord has no duty to supply fire-fighting equipment for leased premises. *Commonwealth v. Madison,* 269 Ky 571, 108 SW2d 519, 523-24 (1937); *Geer Company v. Hall County Airport Authority,* 193 Neb 17, 225 NW2d 32, 36 (1975); *Stewart v. Raleigh County Bank,* 121 W Va 181, 2 SE2d 274, 277 (1939). *Cf. Yall v. Snow,* 201 Mo 511, 100 SW 1, 2-3 (1906) (fire escape); *Moore v. Dresden Inv. Co.,* 162 Wash 289, 298 P 465, 469 (1931) (fire escape). Plaintiff points to no statute imposing a duty upon defendant to supply or maintain

---

[4] Since the fire occurred at a time when the barn and fairgrounds were open, it is unnecessary to address the question whether the result would be different had the fire occurred at a time when plaintiff had no access to the horses.

fire-fighting equipment in the barn. We note, however, that Restatement (Second) Torts § 323 (1965) provides:

> "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> "(a) *his failure to exercise such care increases the risk of such harm, or*
>
> "(b) the harm is suffered because of the other's reliance upon the undertaking."

There was no evidence that plaintiff relied upon the availability of the fire extinguishers in entering into her arrangement with defendant or in failing to supply her own fire extinguisher. There was, however, evidence from which the jury could infer that defendant negligently failed to maintain the water extinguisher in an operable condition.

Evidence of negligence alone does not warrant the submission of a case to the jury. In addition, there must be evidence from which a jury could find that the negligence was a substantial factor in causing the damage. *Babler Bros. v. Pac. Intermountain,* 244 Or 459, 462-65, 415 P2d 735 (1966). The evidence showed that the boy who started the fire ran the length of the barn, grabbed the water extinguisher and the dry chemical extinguisher and returned to the fire. He "turned on the water, and it went for a couple of seconds, and it went out." When he attempted to use the chemical extinguisher, it spread the fire more.[5] After these unsuccessful attempts to extinguish the fire, the boy ceased his efforts and proceeded to take steps to call in an alarm. The boy spent only a brief period of time trying to use the extinguishers on the fire and there was evidence to suggest that the fire

---

[5] Plaintiff does not allege that defendant negligently maintained the dry chemical extinguisher, or that the act of supplying an extinguisher unsuited for putting out wood fires was negligent.

department could not have saved the horses in any event had there been no delay. But we conclude that there was at least some evidence, however minimal, that the attempt to use the inoperable extinguisher caused delay and therefore increased the risk of harm. Motions for nonsuit or directed verdict should not be granted except in those exceptional cases where reasonable men could only conclude that a defendant was not negligent or that the negligence was not a substantial factor causing the injuries. *James v. Carnation Company,* 278 Or 65, 69, 562 P2d 1192 (1977). Whether the delay caused by the attempt to use the extinguisher was a cause of plaintiff's damage was a close question but one which should have been submitted to the jury.

Defendant argues that it cannot be liable for plaintiff's damages because ordinarily a lessor is not liable for damages sustained by a lessee arising out of a criminal act or intentional misconduct of a third party. *See* Annotation, 43 ALR3d 331 (1972); Restatement (Second) Property § 17.3 and Comment 1 (1977). Since there was evidence from which the jury could have believed that the boy was simply negligent in starting the fire, we need not address this contention.

Defendant also argues that there is no evidence that the County, rather than merely the Fair Board, was negligent, and that since the Fair Board is analogous to a private group, the County is not liable for any negligence of the Fair Board. We disagree. ORS 565.210 through 565.330 outline the organization, authority and duties of county fair boards. Under these statutes the fair board, which is appointed by the board of county commissioners, ORS 565.210(2), has broad authority. It "has the exclusive management of the ground and all other property owned, leased, used or controlled by the county and devoted to the use of the county fair, and is entrusted and charged with the entire business management and financial and other affairs of such fair." ORS 565.230(1). The board may "make and enforce all rules and regulations necessary

for the proper conduct and management of their respective fairs. It may appoint such marshals or police as may be necessary to keep order and preserve the peace during the time and at the place of holding the fairs and at all other times when the board deems such appointments necessary for the preservation of the peace and the protection of public and private property upon the fairgrounds." ORS 565.240. Among its other functions, county fair boards are empowered to collect and disseminate educational information, ORS 565.250, and to handle and disburse county fair moneys from the county treasury, ORS 565.315. ORS 565.290(1) indicates that the decision to hold a county fair is that of "a county through its county fair board." From the foregoing we conclude that a county fair board is a county agency, and that the county is liable for its negligence.

Reversed and remanded.