FIREMAN'S FUND AMERICAN INSURANCE COMPANY, et al., Plaintiffs, Appellees,

and

Master's International, Inc., Plaintiff, Appellant,

v.

ALMACENES MIRAMAR, INC., et al., Defendants, Appellees.

FIREMAN'S FUND AMERICAN INSURANCE COMPANY et al., Plaintiffs, Appellants,

v.

ALMACENES MIRAMAR, INC., et al., Defendants, Appellees.

Nos. 80–1016, 80–1028.

United States Court of Appeals, First Circuit.

Argued Feb. 5, 1981.

Decided May 13, 1981.

Rehearing Denied June 15, 1981.

Paul E. Calvesbert and Harry A. Ezratty, San Juan, P. R., with whom Jimenez & Fuste, San Juan, P. R., was on brief, for plaintiffs, appellants.

Antonio Montalvo Nazario, Hato Rey, P. R., with whom Segurola, Montalvo & Lugo, Hato Rey, P. R., was on brief, for appellees Credito E. Inversiones de San Miguel and National Insurance Company.

Before CAMPBELL, BOWNES and BREYER, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

On August 19, 1976, fire completely destroyed a warehouse building in San Juan, Puerto Rico, that was owned by Credito E Inversiones de San Miguel, Inc. (Credito). Part of the building was leased to Almacenes Miramar, Inc. (Almacenes) and used by the lessee as a bonded and public warehouse. Credito, Almacenes and their insurers were sued in federal district court by three insurers, and one uninsured owner of goods that were stored with Almacenes and destroyed in the fire. Jurisdiction was based on the diverse citizenship of the parties. On the last day of trial, but before the case went to the jury, the defendants moved for a directed verdict, which was granted by the district court as to Credito and its insurer. The case against Almacenes and its insurer was submitted to the jury, which in a special verdict found that Almacenes had been negligent but that its negligence was not the proximate cause of the plaintiffs' losses. Judgment was therefore entered in favor of Credito, Almacenes and their insurers. Plaintiffs now appeal, arguing first that the district court erred in

directing a verdict for Credito and, second, that it improperly instructed the jury on an issue concerning Almacenes' negligence. We affirm.

We begin with a review of the evidence in the light most favorable to the plaintiffs. *See Manning v. Grimsley*, 643 F.2d 20, 22 (1st Cir. 1981).

Credito E Inversiones de San Miguel, Inc. is a Puerto Rico corporation engaged in the real estate business, and particularly in the leasing of offices and buildings. Credito owned a warehouse building in San Juan, described as,

> "a steel structure over driven piles, of reinforced concrete beams with terracota walls, steel doors, and aluminum roofing with fiberglass insulation. This building also [had] roofs (one half waters) on three (3) sides of the building and reinforced concrete floors with a floor area of approximately 52,500 square feet."

As of the date of the fire, August 19, 1976, the building was leased to five tenants: Richardson-Merrell Interamericas, Inc. (by lease of March 8, 1971, renewed August 24, 1973 and August 29, 1975); Perez Distributors (by lease of January 26, 1972); Caribbean Bankers Life Insurance Co. (by lease of January 1, 1976); My Line Cosmetics (by lease of March 30, 1976); and Almacenes Miramar, Inc. (by lease of April 28, 1976). The different portions of the building occupied by the tenants were, at least at some points, separated by walls of cement blocks reaching part way to the ceiling, with chain link fencing on top.

The tenants used the building for storage of their own or others' goods. Perez Distributors and My Line Cosmetics kept cosmetics and gift items in their portions of the building. Caribbean Bankers stored old files. Richardson-Merrell stored a variety of pharmaceutical products, including large amounts of Vicks VapoRub and Cepacol. Almacenes Miramar used its space as a bonded and public warehouse and stored for its clients, among other things, pianos, organs, barrels of mackerel, procelain, metal and ceramic goods, and tires.

The building was to a limited extent secured against theft and fire. It was surrounded by a six-foot chain link fence with padlocked gates and lit at night by four exterior lights. Unlike some other nearby buildings, it had no private guards. Police, however, patrol the area. The building lacked a sprinkler system and fire or smoke alarms, but was equipped, according to Ernesto del Castillo Guerra, the vice-president and manager of Almacenes, with 20 fire extinguishers and two 75-foot hoses. Del Castillo also stated that at closing time, the valves on the propane tanks of the forklifts used in the warehouse were closed and all electricity to the warehouse was shut off.

Prior to the fire that destroyed the building, there had been two, and possibly more, break-ins. After being informed of them by the lessees, Bartolome Morell, the administrator of Credito, had the fence surrounding the building repaired and sought to help the tenants obtain a private guard service. Richardson-Merrell balked at the expense of hiring guards, and the matter was dropped. Perez Distributors, apparently on its own initiative, subsequently installed a burglar alarm.

Of the five leases executed by Credito, only Richardson-Merrell's provided that the lessee was not,

> "to store or handle within the leased premises any merchandise or article that may constitute an abnormal fire or other hazard to the unleased portion of the property or its tenant or to neighboring properties."

Credito's administrator, Bartolome Morell, acknowledged having checked "to find out what particular type of products were to be stored" by Richardson-Merrell, but stated that he did not at the time consider pharmaceuticals to be a hazard. According to expert testimony offered at the trial, however, the alcohol content of the Vicks VapoRub in the quantity stored by Richardson-Merrell (about 22 tons), was the equivalent of 5,000 gallons of gasoline in terms of "burning power." The same expert testified that Vicks burns "at about 200 or 300 degrees" Farenheit. By comparison, he in-

dicated that paper and wood burn at about 400 degrees Farenheit and concrete loses structural strength at about 800 degrees. Labels on the individual bottles of Vicks warned, "To avoid possibility of fire, never place vapor rub jar in any container in which you are heating water." About 1,000 gallons of Cepacol, which, according to the expert, is 14 percent alcohol, were being stored by Richardson-Merrell at the time of the fire. The expert also explained that the combustibility of alcohol decreases significantly when it is mixed with noncombustible materials.

The cause of the fire that destroyed Credito's building on August 19, 1976 apparently remains unknown, but a police report strongly suggests, and the parties assume, that it was arson.

"[T]he area was inspected and it could be noticed that one of the unloading half doors of Perez Distributors seems to have been forced and some wood planks have been put so as to avoid the door from closing down. That will allow any person to go inside the warehouse. This half door is toward one end of the building and in front of the abandoned lot. A small gate made of the same material was also found in front of this half door and in the rear part of the cyclone fence. "This gate had a padlock which will not allow it to be opened, but at the same time it showed the hinges to have been broken and it was set aside. This will allow any person to go inside the field through the abandoned lot. We performed a search all through the abandoned lot and could take notice at various sites of some merchandise such as; two pens in their pink and black card board and plastic box, a plastic see-through bag which had inside a great number of crystal figures and two card board boxes with various kinds of thermometers. There was also found various empty card board boxes of different sizes."

The fire broke out in the area of the building leased to Perez Distributors. It spread to Richardson-Merrell's space and from there to the remainder of the building. An expert estimated at trial that when it reached Richardson-Merrell's part of the building, the fire was burning at about 1,000 degrees and was high enough to melt the roof. According to a memorandum from Credito's administrator to the company's principal stockholder reporting a conversation between Mr. del Castillo and the Fire Chief,

"before the fire reached the area of the building occupied by RICHARDSON MERRELL, the firemen had hopes of controlling the fire and preventing that it spread to the other part of the building. Unfortunately, that did not occur, since when the flames reached the area of RICHARDSON MERRELL, the fire spread very rapidly due to the chemical products which that company had in its warehouse and the high content of alcohol in them."

Based on the above, appellants argue that had the district court not directed a verdict for Credito, the jury could have found the company negligent for failing to take adequate precautions against criminal intrusions and fire. Appellants contend that Credito should have provided guards to ward off would-be thieves and arsonists. They further argue that Credito had a duty either to install some form of protection against fire (a sprinkler system, alarms or a watchman) or somehow reduce the enhanced risk of fire posed by Richardson-Merrell's pharmaceuticals. We treat the latter contentions first,[1] applying throughout the law of Puerto Rico.

Appellants base their argument that Credito could have been found negligent for

---

1. At trial, the plaintiffs-appellants argued that Credito was negligent in partitioning its building with walls that did not reach the ceiling, thus leaving a space through which the fire reached the goods stored by Almacenes. The district court, in its order directing a verdict for Credito, found that "[t]he opening in the wall

... is an obvious architectural feature and there is no defect and there was no foreseeability of risk by the owner." Appellants have not challenged this finding in their briefs. It received little attention at oral argument and counsel cited no evidence which would cause us to question the district court's finding.

failing to equip its building with fire protection equipment[2] on article 1802 of the Puerto Rico Civil Code, which provides that,

"A person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done. Concurrent imprudence of the party aggrieved does not exempt from liability, but entails a reduction of the indemnity."

P.R. Laws Ann. tit. 31, § 5141. Article 1802 has long been held to impose upon owners of a building a duty of care toward tenants and their guests or invitees, but only in contexts of little relevance here. *See Prado v. Quinones*, 78 P.R.R. 309 (1955) (lessor's failure to correct dangerous walkway laid by lessee and provide safe access to apartments during major repair work by lessor on lessee's hotel); *Vasquez v. Antunano*, 61 P.R.R. 745 (1943) (lessor's failure to repair a rotted bathroom floor; not actionable due to lack of notice); *Torres v. Fernandez*, 56 P.R.R. 459 (1940) (lessor's failure to repair a decayed wooden stairway); *Perez v. Gandia*, 32 P.R.R. 517 (1923) (lessor's failure to maintain building which eventually collapsed). At common law[3] an owner has in general *no* duty to provide his building with any sort of firefighting equipment or warning system and so cannot be held liable for failing to do so. *See Dundas v. Lincoln County*, 48 Or.App. 1025, 618 P.2d 978, 984 (1980); *Geer Co. v. Hall County Airport Authority*, 193 Neb. 17, 225 N.W.2d 32, 36–37 (1975); *Stewart v. Raleigh County Bank*, 121 W.Va. 181, 2 S.E.2d 274, 277–78 (1939) (citing cases); *Commonwealth v. Madison*, 269 Ky. 571, 108 S.W.2d 519, 523–25 (1937) (citing cases); Annot., 66 A.L.R. 1393 (1930). *Cf. Centraal Stikstof Verkoopkantoor N.V. v. Pensacola Port Authority*, 205 F.Supp. 724, 726–28 (N.D.Fla.1962), *aff'd*, 316 F.2d 189 (5th Cir. 1963) (in general, no duty of owner to adjoining landowner);

*Comfort v. Stadelman Fruit, Inc.*, 285 Or. 525, 592 P.2d 213, 220 (1979) (in general, no duty of owner to adjoining landowner).

Notwithstanding the above, courts have suggested that there are some special situations where an owner may be held liable. Thus, an owner may be liable to tenants or adjoining landowners for failing to take precautions against fire if a statute requires that he take such precautions, *see Raleigh County Bank, supra*, 2 S.E.2d at 277; *Madison, supra*, 108 S.W.2d at 523; or if he has agreed to do so in the lease, *see Dundas, supra*, 618 P.2d at 984; *Geer Co., supra*, 225 N.W.2d at 36; or if he knowingly fails to warn a tenant of a concealed dangerous condition of the building, *see Raleigh County Bank, supra*, 2 S.E.2d at 277; or if he undertakes precautionary measures and carries them through negligently, *see Dundas, supra*, 618 P.2d at 984–85; *Raleigh County Bank, supra*, 2 S.E.2d at 278; or if he uses or stores "dangerously inflammable or explosive or hazardous materials" that create "a foreseeably substantially greater probability of a fire spreading," *Comfort, supra*, 592 P.2d at 220. *See also Centraal Stikstof, supra*, 205 F.Supp. at 728 (suggesting liability would be imposed for storage of materials creating "a clearly hazardous condition").

None of these exceptions to the general rule of non-liability governs this case. It is not disputed that Credito had no statutory duty to take precautions against fire. Its building was inspected by federal and Commonwealth officials in connection with Almacenes' application for a warehouse license and apparently satisfied whatever requirements existed. Nothing in any of the leases imposed a duty to provide fire protection. On the contrary, the arrangements between Credito and its tenants were such that the tenants were responsible for maintenance of the building and paid all

---

**2.** We assume without deciding that those who stored goods with Almacenes were owed a duty by Credito comparable to whatever duty Credito owed the tenants of the building. *See Sample v. Chapman*, 7 Wash.App. 129, 497 P.2d 1334, 1336 (1972); *Corbett v. Salusti*, 330 Mass. 273, 112 N.E.2d 802, 804 (1953).

**3.** Puerto Rico decisions in this area have drawn on the common law. *See, e. g., Prado, supra*, 78 P.R.R. at 329–31; *Vazquez, supra*, 61 P.R.R. at 750–51.

ordinary operating expenses such as water, gas, telephone and electrical charges; they bore the costs of the exterior night lighting and Perez Distributors installed a burglar alarm at its own expense. There is no evidence that Credito agreed to provide security against fire and then performed its undertaking negligently, or knowingly failed to warn its tenants of a concealed dangerous condition of the building. And Credito itself is not claimed to have used or stored in the building any "dangerously inflammable or explosive or hazardous materials."

As an alternative basis upon which Credito supposedly could have been found negligent, appellants suggest that under article 1444 of the Civil Code, which obligates a lessor "[t]o maintain the lessee in the peaceful enjoyment of the lease during all the time of the contract," P.R. Laws Ann. tit. 31, § 4051(3), Credito was liable to them for permitting Richardson-Merrell to store dangerously flammable pharmaceuticals.

In *Goenaga v. West Indies Trading Corp.*, 88 P.R.R. 847 (1963), the Supreme Court of Puerto Rico held that, under article 1444, an owner may in certain circumstances be liable to a lessee for failing to take precautions against the risk of fire posed by another lessee's activities. There, an owner leased the second floor of his building to the operator of a garment factory and the basement and first floor to West Indies Trading Corp., a tobacco and cigar manufacturer. West Indies used the basement of the building to fumigate tobacco, employing in the process carbon bisulphide, a liquid that upon evaporation circulated throughout the basement and up to the first floor. According to the findings of the lower court in *Goenaga*,

"'Carbon bisulphide and bisulphide gas are extremely inflammable and explosive substances. Their vapors or gases may be set off by sparks, friction, flames or flashes of light. They are not inherently explosive. In sufficient concentration, bisulphide gas may set off an explosion merely by the flashing of a common electric bulb. Such gas is extremely volatile, it being almost impossible to prevent it from leaking even from within a completely closed space. For that reason fumigation operations with bisulphide gas are considered a latent hazard, unless due precautions and care are taken.'"

88 P.R.R. at 856. Despite the obvious danger, the basement of the building was lit with single bulbs hanging by their cords. Some of the lights were controlled by unscrewing the bulbs, which occasionally caused shocks and sparks.

About two years after West Indies occupied its portion of the building, a fire broke out in the basement, doing only minor damage. (Significantly, West Indies' insurer thereafter cancelled the company's policy.) Concerned about the fire, the operator of the garment factory wrote to the owner of the building, warning him of the dangerousness of West Indies' fumigation process. In response, the owner suggested that the garment factory obtain more insurance or move. Four months later, a West Indies employee switched on a basement light, setting off a tremendous explosion followed by a fire that consumed the entire building.

The operator of the garment factory sued West Indies and the owner of the building for damages. Both were held liable:

"Francisco [the owner] failed to comply with his legal obligation to maintain Goenaga in the peaceful enjoyment of the thing during the entire lease term by permitting, first, the creation of a situation of hazard arising from the fumigation activity of West Indies, and then, through his negligence, by his inaction, in suffering such situation to continue; and West Indies failed to comply with its obligation to Goenaga, first, in establishing the plant for the process of fumigation, with its potential hazard of fire or explosion by the use therein of carbon bisulphide gas, and then, through his negligence in not adopting the measures of care and precaution and technical guarantees recommended for the development of such a hazardous activity. Both are collaborators in the situation of hazard to which Goenaga was exposed, and in the

cause of the disaster; and under those circumstances neither the theory of the need of control or possession of the thing, nor that of proximate cause, comes into play here as respects Francisco in order to hold him liable to Goenaga, jointly with West Indies, for the damages suffered by her as a result of the fire which destroyed her business."

88 P.R.R. at 884 (footnote omitted).

Looking to the facts of the present case, we believe they are so distinguishable from *Goenaga* as to preclude, as a matter of law, holding Credito liable on account of Richardson-Merrell's storage of pharmaceuticals. Absent here is the predicate of the duty recognized in *Goenaga*—the " 'notorious hazard of danger' implied by the fact of storing 'inflammable and explosive substances' ...." 88 P.R.R. at 881. The material at issue in *Goenaga*, carbon bisulphide, was extremely explosive. It evaporates at less than 100 degrees and can be ignited by the smallest spark. 88 P.R.R. at 880–81 & n.9. According to the court,

" 'Carbon bisulphide vapor *is extremely explosive. It has a low flashpoint* and is subject to detonation. Its danger may best be illustrated by the fact that an iron rod heated by boiling water and passed through the gas explodes it. An electric light bulb is sufficiently hot to explode the gas, or the heat created by the sun on a metal roof can do it. *The product is, therefore, considered too hazardous for general fumigation, and its use is not recommended.*"

88 P.R.R. at 871 n.4 (emphases in opinion), *quoting* National Fire Protection Association, 1 *National Fire Codes* 517 (1951). *Cf. Comfort, supra*, 592 P.2d at 220 (describing oil-soaked sawdust as an example of a dangerously inflammable material). Further, the chemical was allowed to circulate in large areas of a building furnished with an inadequate electrical system; indeed, the fire was apparently caused by turning on a single light switch. Finally, the owner in *Goenaga* failed to take any precautions despite the obviously hazardous nature of his tenant's activities, a prior fire and a plea

from his other tenant. At common law, "[a] landlord is not responsible to one tenant for the condition of premises leased to other tenants or for the use of such other premises by such other tenants where he does not authorize or sanction such condition or use of the other premises." 49 Am. Jur.2d, *Landlord & Tenant* § 804 (1970). *See* Annot., 38 A.L.R. 250 (1925). In *Goenaga*, the owner had clearly authorized West Indies' dangerous activity and so, in the court's words, became liable as a "collaborator [ ] in the situation of hazard." 88 P.R.R. at 884.

■ Not so here. Credito's lease with Richardson-Merrell expressly prohibited storing or handling "any merchandise or article that may constitute an abnormal fire or other hazard ...." Credito's administrator inspected the premises "to find out what particular types of products were to be stored" by Richardson-Merrell and testified that he was satisfied that the pharmaceuticals posed no unusual hazard. There was no evidence to show that his conclusion was other than reasonable. Vicks VapoRub and Cepacol are products commonly kept in homes and stores; they would hardly seem dangerous to a lay person. According to expert testimony, labels on the jars of Vicks warned only against placing them in containers in which one is heating water; this hardly suggests that the mere storage of such jars constitutes an abnormal fire hazard. There is no evidence of any warning at all being affixed to the Cepacol containers. True, plaintiffs' expert opined that the 22 tons of Vicks stored by Richardson-Merrell was the equivalent of 5,000 gallons of gasoline in terms of "burning power," but there was no evidence from which a jury could deduce that someone not versed in chemical analysis would have been aware of the asserted equivalence. In addition, the same expert testified that the combustibility of the products was significantly reduced first by their nonflammable ingredients and second by their being packaged in individual bottles stored in cartons. Indeed, the expert indicated that when the fire finally reached and ignited the pharmaceuticals, it was already burning at about 1,000 degrees

and was high enough to melt the ceiling. *Compare Centraal Stikstof, supra,* 205 F.Supp. at 727–28 (indicating that "dangerously inflammable or explosive materials" must be more than "highly combustible"). As a last contrast with *Goenaga,* there is no evidence here of any previous fires in Credito's building or of any complaints by tenants with respect to the products stored by Richardson-Merrell. On these facts, Credito could not reasonably have been found to have "authorized" a tenant's dangerous activity. Credito and Richardson-Merrell were not "collaborators" in a "situation of hazard" and there is thus no basis upon which to hold Credito liable for such negligence, if any, as may be attributed to Richardson-Merrell for storing large quantities of flammable pharmaceuticals. Appellants point to no case where an owner has been held liable where the level of risk inherent in a tenant's activity was as slight and unobvious as it was here.

■ Appellants' final argument directed to the issue of Credito's liability for their losses in the fire of August 19, 1976, is that, in light of prior break-ins at its building, Credito had a duty to provide the building with "24 hour security guard service." It is not clear whether, or in what circumstances, an owner such as Credito owes its commercial tenants a duty to take measures to protect them against crime, *see* Annot., 43 A.L.R.3d 331 (1972); 52 C.J.S. *Landlord & Tenant* § 417(6), at 55 (1968), but assuming *arguendo* that such a duty existed here, we believe that Credito did all it was required to do thereunder.

There is no allegation that Credito's building was structurally inadequate with respect to security. So far as appears, the building as a whole—doors, windows, etc.,—was reasonably secure against break-ins. The building was equipped with external lights and surrounded by a six-foot chain link fence with padlocked gates. Further, as stated by Bartolome Morell, the administrator of Credito, and confirmed in the inspection report of a federal customs inspector, the area was regularly patrolled by the police at all hours. When informed of break-ins at the building, Credito repaired the fence around the building and sought to help the lessees arrange for a guard service. The idea was rejected by Richardson-Merrell due to the expense involved.

Having done this much, we do not think Credito can be faulted for not going further and hiring a guard service at its own expense. As the leases made clear, the tenants were responsible for the operating expenses of the building. They paid for water, gas, telephone and electricity, including the costs of the exterior night lights. When Perez Distributors installed a burglar alarm, it bore the expense. Though Credito's administrator, Mr. Morell, testified that other buildings in the area were protected by private guard services, there is no evidence that these buildings were leased (and on what terms), nor that the owners had provided this security measure on behalf of the lessees.

Under these circumstances, the jury could not reasonably have found Credito negligent for failing to provide, at its own expense, a guard service for its building. We have already determined that on the present facts Credito cannot be held liable for not installing a sprinkler system, providing fire or smoke alarms, hiring a watchman, or restricting Richardson-Merrell's activities further than it had already tried to do in drafting its lease and inspecting the premises. The district court was thus correct to direct a verdict for Credito.

As to the jury verdict in favor of Almacenes, the operator of a bonded and public warehouse in Credito's building, appellants argue that it must now be overturned because of an error in the district court's instructions to the jury. The court instructed the jury "that the presence in the storage area of the pharmaceutical products of the types stored in the area leased by the defendant Richardson-Merrell does not constitute an inherent or abnormal fire hazard." This statement, appellants argue, prevented the jury from making its own assessment of the hazardous nature of Richardson-Merrell's pharmaceuticals and so removed the possibility of their finding that

Almacenes was negligent in not protecting the goods in its care from an unreasonable (if not technically "notorious" or "inherent," *see supra*) risk of fire.

This argument ignores the fact that Almacenes was found by the jury in a special verdict to have *been* negligent. The defendants thus seem to have won their point that Almacenes ought to have done more to protect the goods in its charge. Judgment was entered in Almacenes' favor because of the jury's further finding that Almacenes' negligence was not the proximate cause of plaintiffs-appellants' losses. Whatever the shortcomings, if any, of the district court's instruction, we do not see how it could have affected the jury's determination that Almacenes' negligence did not proximately cause the losses at issue.

*Affirmed.*